Thomas P. LOUGHLIN,
et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

No. CIV.A. 02–152(ESH).

United States District Court,
District of Columbia.

Nov. 19, 2002.

Patrick Michael Regan, Regan, Halperin & Long, P.L.L.C., Washington, DC, for Plaintiffs.

Thomas M. Ray, Joel E. Wilson, U.S. Attorney's Office, Mitchell E. Zamoff, Hogan & Hartson, L.L.P., Kirby D. Behre, Paul, Hastings, Janofsky & Walker, L.L.P., Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

The Loughlins have brought suit against the United States ("government"), American University ("American" or "AU"), and Glenbrook Limited Partnership, Lawrence N. Brandt, Inc., Lawrence N. Brandt, and Robert Brandt [hereinafter referred to collectively as "Glenbrook–Brandt"] because of the presence of munitions, highly toxic chemicals, and chemical warfare agents on their residence at 4825 Glenbrook Road.[1]

---

1. Specifically, the Loughlins have filed claims for negligence and failure to warn against all three defendants and have also filed claims

Glenbrook–Brandt has filed cross-claims for negligence against the United States seeking compensation for property damage and indemnification for any sums Glenbrook–Brandt may have to pay plaintiffs.[2] This Memorandum Opinion addresses only the claims and cross-claims against the government and the Loughlins' claims against Glenbrook–Brandt. The United States has moved to dismiss the Loughlins' claims for lack of subject matter jurisdiction under the Federal Tort Claims Act ("FTCA"), and for summary judgment based on the Loughlins' assumption of the risk. The United States has also moved to dismiss the Glenbrook–Brandt cross-claims for lack of subject matter jurisdiction under the FTCA. With respect to the FTCA actions, defendant United States asserts that this Court lacks subject matter jurisdiction because: (1) the claims are barred by the statute of limitations provisions of the FTCA, see 28 U.S.C. §§ 1346(b), 2401(b), 2675; (2) there is no analogous private liability sufficient to establish government liability for the alleged negligence, see 28 U.S.C. § 2674; and (3) the claims are barred by the discretionary function exception to the FTCA, see 28 U.S.C. § 2680(a).[3] Glenbrook–Brandt has moved for summary judgment with respect to the Loughlins' failure to warn claim, arguing that plaintiffs are barred from bringing suit because Glenbrook–Brandt made full disclosure.[4] Although the Court reserves judgment on the discretionary function argument until the issue is fully briefed and argued by all parties (see supra note 3), it concludes that the other arguments of the government must be rejected, and that Glenbrook–Brandt's motion for summary judgment should be denied.

## BACKGROUND

In April 1917, in order to support the war effort against Germany, AU offered the United States the use of its 92–acre campus in what is now known as the Spring Valley neighborhood of Northwest, Washington, D.C. The government accepted AU's offer and established the American University Experiment Station (AUES) on the property. The AUES was the site of a massive training, research and testing ground for conventional and chemical warfare techniques. (Loughlin Compl. ["Compl."] ¶ 15.) The Army conducted projects and field tests related to the development, testing and manufacture of gases, toxic and incendiary munitions, smoke mixtures, and signal flares. These activities were conducted using gas shells, smoke clouds, mortars and projectiles,

---

2. Glenbrook–Brandt filed cross-claims in both the instant matter and in the *Gillum* case. The claim for direct liability was filed only by defendant Lawrence N. Brandt. The claim for derivative liability was made by all the Glenbrook–Brandt defendants.

for fraud, deceit, and outrageous conduct against Glenbrook–Brandt and AU. Patricia Gillum, who worked as a nanny for the Loughlin family, has filed negligence claims against AU and Glenbrook–Brandt in *Gillum v. The American University*, Civil No. 02–294. Gillum's claim against the United States was dismissed without prejudice for failure to exhaust administrative remedies

3. AU has also filed cross-claims against the government in the *Loughlin* and *Gillum* cases, as well as a third related case, *Saum v. The American University*, Civil No. 02–349. The government has moved to dismiss AU's cross-claims in all three cases on the grounds, *inter alia*, that any failure to warn claim is barred by the discretionary function exception, but since this issue has yet to be fully briefed, this Court will not rule on it at this time.

4. This Memorandum Opinion constitutes the Court's opinion as to these motions in both *Loughlin v. United States*, Civil No. 02–152, and *Gillum v. The American University*, Civil No. 02–294.

**30**

hand grenades and flaming liquid weapons. (*Id.* ¶ 15.)

In approximately 1920, AU voted to release the government from its obligation to clear and restore the property before it was returned to AU. In exchange, the government was to build eight buildings for AU. (*Id.* ¶ 18.) (*See* Memorandum of Agreement between U.S. and American University, Memorandum in Support of Defendant United States' Motion to Dismiss Plaintiff's Complaint, or In The Alternative, for Summary Judgment ["U.S. Def.'s Mem."] Ex. 5.) [5]

In addition to using AU for military efforts, the United States Department of Agriculture ("USDA") operated a laboratory on the campus from 1919 to 1945 to develop pesticides and herbicides. (January 13, 1994 Memorandum from Lawrence Richardson to Karen Solari, Memorandum in Support of Glenbrook–Brandt Defendants' Motion for Summary Judgment ["Glenbrook–Brandt Defs.' Mem."] Ex. 3.)

Prompted by the discovery of a 1921 article in *The American University Courier* indicating that the Army had buried munitions on or near the campus during World War I and by the University's plan to construct a new athletic complex, AU initiated in 1986 an extensive literature search and conducted personal interviews in an effort to obtain information substantiating or refuting the report of buried munitions on AU property. No such information was uncovered. (Defendant American University's Response to The United States of America's Motion to Dismiss, or In The Alternative, for Summary Judgment ["AU Def.'s Resp."] Ex. 4.) AU also contacted the Army Corps of Engineers ("Corps") to inquire about the reports and for assistance as it began construction of

the new athletic facility. (U.S. Def.'s Mem. Ex. 7.) In response, the Corps conducted a document search at the U.S. Army Military History Institute and concluded:

> There is no official evidence of any such burial at AU. Official correspondence from the period strongly suggests that all munitions were removed to Edgewood Arsenal . . . . If any materials were buried, they would probably have been small quantities of laboratory or experimental materials. All sources we found were inconsistent with the notion of substantial quantities of any munitions or the components for munitions existing at AU.

(AU Def.'s Resp. Ex. 10.) The Corps' report questioned the credibility and accuracy of the *Courier* articles, but also noted "[w]e could not disprove the burial of some materials on or near Camp American University." (*Id.*) As part of this investigation, AU and representatives of the Army reviewed a 1918 aerial photograph of the AUES that clearly indicated the presence of a substantial bomb pit directly on or near the 4825 Property. (Compl. ¶ 24.) However, the Corps' onsight survey of the construction site did not produce evidence of any suspicious items. (AU Def.'s Resp. Ex. 8.) Nonetheless, the Corps remained on site to supervise the excavation and caisson drilling phase of the construction. (*Id.*)

Plaintiffs assert in their complaint that in 1986, the Environmental Protection Agency ("EPA") also conducted a study for the Corps and concluded that the 4825 Property contained a probable burial ground for dangerous munitions and highly toxic materials. (Compl. ¶ 23.) This allegation is disputed by the government. (Defendant United States of America's

---

**5.** The exhibits submitted in support of the U.S. Def.'s Mem. are identical to those offered by the government with respect to its Motion to Dismiss the Cross–Claims of Defendants Glenbrook Limited Partnership, Lawrence N. Brandt, Inc. and Robert Brandt ["U.S. Def.'s Mem. to Dismiss Cross–Cl."] in both the *Loughlin* and *Gillum* cases.

Statement of Material Facts to Which There is No Genuine Dispute ["U.S. Def.'s Stat."] ¶ 18.)

In 1990, Glenbrook–Brandt purchased from AU a parcel of land adjoining the AU campus and it began construction of two residential homes two years later. Construction was halted twice in May 1992 after Glenbrook–Brandt's workers were overcome by strong odors and suffered eye and lung pains requiring emergency hospital care. (Compl.¶ 31.) The construction also uncovered old laboratory equipment, possible chemical contaminants, broken jars, and a 55–gallon drum. (*Id.*) Glenbrook–Brandt notified AU of these developments and requested that AU investigate. AU retained Environmental Management Systems ("EMS"), an industrial hygiene consulting firm, to investigate the incident. (U.S. Def.'s Stat. ¶¶ 23–24.) The EMS investigation began on May 8, 1992. (*Id.* ¶ 24.) The first tests performed by EMS analyzed soil for pesticides and metals. (February 18, 1999 Letter, U.S. Def.'s Mem. Ex 8.) From these tests, "EMS concluded that there were no hazardous, volatile or controlled substances at the site." (*Id.*) EMS's results, forwarded to Brandt by AU, found that "[soil] samples are well within the EPA's criteria for acceptable levels for the materials noted. The dirt is acceptable for dumping to any area and will not present a health or environmental hazard." (May 20, 1992 Letter, Glenbrook–Brandt Defs.' Mem. Ex. 5.) The second set of tests performed by EMS identified the presence of the herbicide Silvex in the soil. EMS's report on these tests explained that Silvex is very irritating to the eyes and senses,

but is not a hazardous substance. Specifically, EMS concluded that "[a]ccording to the EPA, silvex (*sic*) contaminated soil should not be disposed of near waterways, streams, wetlands or where crops are to be planted .... due to the acidic nature of the substance .... [which] could be toxic to fish. However, the substance does not have a pollution potential to the food chain." (June 4, 1992 Letter, U.S. Def.'s. Mem. Ex. 10.) Later that summer Glenbrook–Brandt removed four loads of the Silvex-contaminated soil from the 4825 property and proceeded with construction. (Compl. ¶ 35; February 8, 1999 Letter, U.S. Def.'s Mem. Ex. 8.)

In January 1993, the Corps initiated a remedial investigation for buried ordnance and contamination in Spring Valley which was referred to as Operation Safe Removal Formerly Used Defense Site ("OSR FUDS"). (U.S. Def.'s Mem. to Dismiss Cross–Cl. ¶ 28.) The investigation was triggered by the discovery of a munitions bunker approximately one mile away from the 4825 property.[6]

In January 1994, the Corps contacted Glenbrook–Brandt to request access to the properties at 4825 and 4835 Glenbrook to sample the soil. The request letter stated, "the soil in your area is not known to pose any danger to the residents. Soil sampling is to be conducted solely to provide an added assurance to the community and to assist us in completing a thorough investigation of Spring Valley." (January 12, 1994 Letter, Glenbrook–Brandt Defs.' Mem. Ex. 7.) Glenbrook–Brandt consented. (January 26, 1994 Consent of Property Owner, Glenbrook–Brandt Defs.' Mem. Ex. 8.)[7]

---

**6.** The discovery of munitions on this property was the basis of a negligence action against the government by the owner/developer of the property. *See W.C. & A.N. Miller Cos. v. United States,* 963 F.Supp. 1231 (D.D.C.1997) (denying defendant's motion for summary judgment and finding that defendant owed a

duty to warn plaintiff, as a subsequent purchaser of property, that defendant had buried munitions on the property).

**7.** Glenbrook–Brandt notes that it is unable to locate the letter seeking access to the 4825 property but that it has copies of signed ac-

In February 1994 the Loughlins tendered a purchase offer to Glenbrook–Brandt to buy the property at 4825 Glenbrook. After executing the sales contract, Lawrence Brandt informed the Loughlins that during construction the workers had unearthed a white crystaline substance together with broken glassware and one or more empty fifty-five gallon drums on the 4825 property. Mr. Brandt informed the Loughlins that AU had told him that the property had once been the site of a "landscaping shed" at which landscaping chemicals and equipment had been stored. Robert Brandt also informed the Loughlins of EMS's findings. (Plaintiffs' Opposition to Defendant United States of America's Motion to Dismiss, or in the Alternative, for Summary Judgment ["Pls.' Opp. to U.S. Def.'s Mot."] Exh B, T. Loughlin Aff. [hereinafter "Loughlin Aff."] ¶¶ 5, 8–9.) However the Loughlins deny that they were informed that significant potential hazards had been identified on the 4825 property by the EPA or that highly toxic chemical warfare materials had been unearthed during the construction of the residence. (*Id.* ¶¶ 13–14.)

As a result of Glenbrook–Brandt's disclosures, the Loughlins hired an independent testing organization, ECS, to sample the soil and conduct an evaluation of potential environmental hazards on the 4825 property. (*Id.* ¶ 10.) Glenbrook–Brandt agreed to assume the costs of theses tests. (March 7, 1994 Letter, Glenbrook–Brandt Defs.' Mem. Ex. 11.) ECS conducted its independent investigation of the 4825 property on behalf of the Loughlins on March 10–11, 1994. ECS analyzed four soil samples for eight metals, including arsenic, and numerous pesticides, herbicides, and volatile and semi-volatile substances. The ECS report stated that "[t]he general vicinity of this residential lot was apparently used in munitions testing in the early part of this century .... Therefore, there is some concern that some contamination may exist around this residence." (March 17, 1994 Letter, Glenbrook–Brandt Defs.' Mem. Ex. 13.) However, it concluded that "no hazardous compounds were found ..." and that "the residential lot at 4825 Glenbrook Road has not been impacted by contamination from hazardous materials." (*Id.*)

On March 21, 1994, the Loughlins contracted to purchase the 4825 property. Prior to closing, the Loughlins and Glenbrook–Brandt entered into an agreement whereby Glenbrook–Brandt indemnified the Loughlins in the event that government studies revealed hazardous materials on the property. As explained by plaintiffs, they requested that there be an Indemnification Agreement because it was expected that the government would conduct further soil sampling at 4825 Glenbrook, but the results would not be known prior to settlement. (Loughlin Aff. ¶ 12.) The Indemnification Agreement stated in pertinent part:

> [A]fter execution of the Initial Sales Contract, the Seller disclosed to the Loughlins that certain materials had been found upon excavation of the property, which may have contained Hazardous Substances as such term is defined herein ... [8]

> [U]pon discovery of the Material, the Sellers contacted the previous owner of the lot ... and learned, for the first time, that the Material may be related

---

cess agreements for both properties. (Glenbrook–Brandt Defs.' Mem. at 6 n. 1.)

**8.** The Indemnification Agreement defines "Hazardous Substance" as "any constituent which the Government detects as a result of its analysis of the soil samples ... on the Property at levels which pose a threat to human health or the environment." (U.S. Def.'s Mem. Ex. 18.)

to past operations of agencies of the United States Government ...

[A]fter having been contacted of this discovery, the previous owner of the lot on which the Property is located retained a consultant to analyze soil samples collected on the lot and represented to the Sellers that said consultant detected the presence of Silvex, a propionic acid formerly used as a herbicide, at levels which would not present a health or environmental hazard ...

[A]gencies of the Government are collecting and analyzing soil samples from the Property to determine whether any Material may pose a risk to human health or the environment ...

(U.S. Def.'s Mem. Ex. 18.)

The Corps and EPA also conducted soil sampling at the 4825 property that same month. (Glenbrook–Brandt Defs.' Mem. at 7.) According to the government, the soil sample was analyzed for chemical warfare agents but the results failed to show detectable levels of these substances or breakdown products. (U.S. Def.'s Stat. ¶ 37.) EPA collected seven soil samples on March 11, 1994, one of which showed an elevated level of arsenic. (U.S. Def.'s Stat. ¶ 39.) The Loughlins claim not to have learned of these tests until they were disclosed by the Corps in early February 1999. (Loughlin Aff. ¶¶ 35–37.) Glenbrook–Brandt also denies receipt of these test results. (Glenbrook–Brandt's Opposition to United States' Motion to Dismiss the Cross–Claim of Glenbrook Limited Partnership, Lawrence N. Brandt, Inc., Lawrence N. Brandt, and Robert Brandt ["Glenbrook–Brandt Defs.' Opp."] at 9.)

In January 1995, the Corps issued a letter to the Loughlins and their neighbors indicating that the analysis of soil samples taken from their neighborhood "did not detect the presence of chemical agents [or] explosives" and that "no hazard to human health or to the environment exists as a result of DoD activities in the area." (Pl.'s Opp. to U.S. Def.'s Mot. Ex. H.) Subsequently, the Corps confirmed this finding in a Record of Decision ("ROD") and concluded that no further action was required with respect to the Spring Valley property, including 4825 Glenbrook Road. (June 2, 1995 U.S. Army Corps of Engineers Record of Decision, Glenbrook–Brandt Defs.' Mem. Ex. 16.). Upon issuance of the ROD, OSR FUDS was complete.

In June 1996, workers planting a tree on the grounds of the AU President's house at 4835 Glenbrook, adjacent to the 4825 property, were overcome by odors and fumes that burned their eyes. The workers unearthed laboratory glassware and broken bottles filled with chemicals. AU called in Apex Environmental, Inc., environmental specialists, to investigate. (Compl. ¶ 41; U.S. Def.'s Mem to Dismiss Cross–Cl. ¶ 58.) The Apex investigation uncovered "numerous laboratory bottles and broken glass pieces ... in the bottom and sides of the excavated area ... [and] a layer of buried glassware in the soil at a depth of approximately two feet below the surface." (U.S. Def.'s Mem. Ex. 22 at 5.) Apex's final report, dated August 6, 1996, concluded that "[i]nitial soil samples revealed elevated levels of certain metals and volatile organic compounds, with arsenic being of most concern." [9] (*Id.* at 48.) An investigation by the District of Colum-

---

9. Plaintiffs claim that they were informed by AU's President, Dr. Ladner, that workers had unearthed a broken bottle containing an unknown chemical liquid having a strong odor and that a firm had been retained to investigate and clean up the soil. However, plain-

tiffs claim that they were not informed of the results of the Apex study or that the chemicals unearthed on the property were hazardous or related to World War I chemical warfare material development activities. (Loughlin Aff. ¶¶ 24–28.)

bia also revealed elevated concentrations of arsenic and other substances. (U.S. Def.'s Mem. to Dismiss Cross–Cl. at 17, ¶ 57.)

In February 1998, the Corps conducted a geophysical survey of the Korean Ambassador's residence at 4801 Glenbrook, which also abuts the 4825 property. (Compl.¶ 45.) The survey "indicated the presence of two suspect disposal pits which would require an intrusive investigation." (*Id.*) In April and June 1998, the Corps sent letters to Spring Valley residents notifying them of the need for additional investigation. (U.S. Def.'s Mem. Exs. 35 and 36.) The April letter stated that the Corps, in coordination with the EPA and the District of Columbia government, would "investigate whether additional chemical warfare materials, breakdown products and potential laboratory contaminants such as containers of mustard gas, exist at this single site." (U.S. Def.'s Mem. Ex. 35.) Further investigation of the 4801 property did not begin until February 15, 1999. (Compl.¶ 45.) At that time, a 75 mm projectile was discovered buried only six inches deep in the backyard of the Ambassador's residence. (Compl.¶ 46.)

The Corps contacted the Loughlins again in December 1998 expressing an interest in further investigating their property "to confirm the absence of buried munitions, remnants thereof, and associated material." (U.S. Def.'s Stat. ¶ 70; U.S. Def.'s Mem. Ex. 26.) Later that month, Corps representatives met with the Loughlins at their home to obtain permission to conduct further testing and to answer their questions. (U.S. Def.'s Stat. ¶ 71; U.S. Def.'s Mem. Ex. 27 at 1.)

The Corps, on behalf of EPA Region III, conducted further soil sampling on the 4825 property on June 9, 1999. (July 26, 1999 *Interim Trip Report Spring Valley Operable Unit 3 Washington, D.C.,* Glen-brook–Brandt Defs.' Mem. Ex 18.) A total of 22 soil samples were collected. (August 13, 1999 *Interim Trip Report Appendix 2, Spring Valley Operable Unit 3 Washington, D.C.,* Glenbrook–Brandt Defs.' Mem. Ex. 19 at 1). All but four "contained arsenic above the EPA Region III Risk–Based Concentration (RBC) value of 0.43 mg/kg," the highest reading being 50.4 mg.kg. (*Id.* at 3.)

In April 2000, Major Brian D. Plaisted of the Corps met with lawyers representing Glenbrook–Brandt and the Loughlins and explained that there was a possibility that a burial pit, similar to the pits on the South Korean Ambassador's property, may be located on the 4825 property. (Glenbrook–Brandt Defs.' Opp. at 12.) Major Plaisted explained that certain munitions were in ceramic casings that could not have been detected by the previously-used investigatory techniques. He also indicated that there was no current evidence to suggest that arsenic existed at any great depth or that arsenic had been an issue at the property before April 1999. (*Id.* at 13.) The Corps' final evaluation and cost analysis for 4801 and 4825 Glenbrook Road reported the results of the June 9, 1999 sampling and concluded that there was an "unacceptable hazard from arsenic" on the property. (*Id.* (citing June 9, 2000 *Draft Final of the Engineering Evaluation/ Cost Analysis for 4801 and 4825 Glenbrook Road,* Ex. 13).)

Plaintiffs Thomas and Kathi Loughlin resided at 4825 Glenbrook Road in Spring Valley from March 1994 to September 2000. Their children, plaintiffs Nora and Hannah Loughlin, were born during that time. In 1997 Kathi Loughlin was diagnosed with a brain tumor. (Compl.¶ 44.) The Loughlins' invoked the terms of their Indemnification Agreement in a February 10, 1999 letter to Glenbrook–Brandt stating:

[t]he apparent presence of hazardous substances in the form of chemical weapons or components has caused the United States Government Investigators to seek access to our property for the purposes of investigation. We do not yet know the dimensions or consequences of this problem, but it appears that our property is becoming ·directly involved and notice to you, pursuant to the Indemnity Agreement, is therefore appropriate.

(U.S. Def.'s Mem. Ex. 28.) In March 1999, the Loughlins were forced to relocate for several months to allow the Corps to remove hazardous materials from two pits on the Korean Ambassador's property. (Compl.¶ 48.) The Loughlins had to move again later that year after high levels of arsenic were detected on their property. (Compl.¶ 50.) The Loughlins invoked the buyback provision of their Indemnification Agreement with Glenbrook–Brandt in a March 27, 2000 letter. The letter requested that Glenbrook–Brandt buy back the property because of the presence of high levels of arsenic in the soil and the removal of more then 23 military ordnance-related items from a disposal pit on the South Korean Ambassador's property. (Glenbrook–Brandt Defs.' Opp at 12.)

As noted, these events have spawned a series of lawsuits, including claims brought by the Loughlins (Civil No. 02–152), by their nanny Patricia Gillum (*Gillum v. The American University,* Civil No. 02–294), another property owner (*Saum v. The American University, et al.,* Civil No. 02–349); and a potential class action on behalf of current Spring Valley property owners (*Jach v. The American University, et al.,* Civil No. 02–1580). While a motion to dismiss AU's cross-claims against the government is currently pending in the cases brought by the Loughlins, Gillum and Saum, it is not yet ripe and it will not be

addressed herein.[10] In addition, the Court has previously denied AU's motions to dismiss the plaintiffs' claims in the *Loughlin, Gillum* and *Saum* cases. *Loughlin v. United States,* 209 F.Supp.2d 165 (D.D.C. 2002). Thus, for the moment the Court will limit itself to the government's motions to dismiss the Loughlins' claims and Glenbrook–Brandt's cross-claims and Glenbrook–Brandt's motion to dismiss the Loughlins' claims. In particular, it will only address the government's arguments based on the FTCA's statute of limitations, the analogous private liability doctrine, and the Loughlins' alleged assumption of the risk, as well as Glenbrook–Brandt's motion to dismiss the Loughlins' failure to warn claim. *See supra* note 3.

## LEGAL ANALYSIS

### I. Standard of Review: Federal Tort Claims Act

The government has moved to dismiss the Loughlins' claims and Glenbrook–Brandt's cross-claims for lack of subject-matter jurisdiction under the FTCA pursuant to Fed.R.Civ.P. 12(b)(1), or with respect to the Loughlins' claims, for summary judgment pursuant to Fed.R.Civ.P. 56. Glenbrook–Brandt has moved for summary judgment with respect to the Loughlins' failure to warn claim. The Court will first address the standard of review for the government's 12(b)(1) motion.

Challenges to subject matter jurisdiction can be "facial" or "factual." *Gould Electronics v. United States,* 220 F.3d 169, 176 (3d Cir.2000); *Federal Election Comm. v. Nat'l Rifle Ass'n,* 553 F.Supp. 1331, 1343 (D.D.C.1983). In a facial challenge, the Court considers the factual allegations of the complaint in the light most favorable to the non-moving party. *Rhoades v. United States,* 950

---

**10.** Motions for class certification and to dismiss are also pending in the *Jach* case.

F.Supp. 623, 628 (D.Del.1996). In the matter before the Court, the government is not attacking the existence of subject matter jurisdiction on the face of the complaint but has made a factual challenge based on the FTCA's statute of limitations. The standard of review for a factual 12(b)(1) attack is different than a facial attack. *Id.* Generally, in a factual challenge, allegations in the complaint are not controlling. *Id.* The Court must weigh the allegations of the complaint and evidence outside the pleadings in order to "satisfy itself as to the existence of its power to hear the case." *Id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. (quoting *Mortensen,* 549 F.2d at 891).

The situation is complicated, however, when the same statute provides the basis for determining both jurisdiction and the merits of the case. *See Gould Electronics,* 220 F.3d at 178 (finding the merits of the case and jurisdiction under the FTCA to be intertwined). These situations "may require a litigant to prove the merits of his claims at the earliest possible stage of the proceeding without the benefit of discovery and trial" because establishing jurisdiction requires the same showing as establishing the merits. *Rhoades,* 950 F.Supp. at 628. "[C]ourts have resolved this conceptual dilemma by assuming jurisdiction, then proceeding to examine the substantive merits of the claim, which contain the same issue as the jurisdictional question." *Id.See also Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (finding that federal question jurisdiction is not defeated based

on a failure to state a cause of action on which the court can grant relief—court must assume jurisdiction to decide the merits of the claim); *Rosales v. United States,* 824 F.2d 799, 803 (9th Cir.1987) (finding that in a FTCA case where jurisdictional question is dependent on factual issues going to the merits, any material jurisdictional facts that are in dispute must be resolved at trial); *Bell v. United States,* 127 F.3d 1226, 1228 (10th Cir.1997) (in FTCA case where the jurisdictional question is intertwined with the merits of the case, a Rule 12(b)(1) motion must be converted to a Rule 56 or 12(b)(6) motion); *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir.1983) (same); *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995) (same). Thus, "when the jurisdictional issues are inextricably intertwined with the merits of the cause of action, courts have not dismissed federal claims on Rule 12(b)(1) motions unless they are clearly insubstantial or immaterial." *Rhoades,* 950 F.Supp. at 629. Instead, they are treated as motions for summary judgment and any material factual disputes are decided at trial. *See American Farm Bureau v. United States Environmental Protection Agency,* 121 F.Supp.2d 84, 104 (D.D.C.2000) ("When ... federal subject matter jurisdiction is dependent on the same statute that provides the substantive claim in the case, the jurisdictional question and the merits are intertwined.... [and] the court is required to convert the Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion." (internal citations omitted).) Here, the FTCA provides both the basis of subject matter jurisdiction and the cause of action.[11] Because the jurisdiction

11. The government relies on *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), and *Federal Election Comm'n v. Nat'l Rifle Ass'n of America,* 553 F.Supp. 1331 (D.D.C.1983), to assert that courts must resolve jurisdiction-

al issues before reaching the merits of a case. These cases are not applicable to the matter at hand because neither involves jurisdictional issues intertwined with the merits of a FTCA claim. Rather, the Court is guided by

question is inextricably intertwined with the merits of the action, the Court must treat the government's motion as one for summary judgment.

A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989). However, the non-moving party's opposition must consist of more than mere unsupported allegations or denials, and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987).

In this case the government has moved to dismiss the claims and cross-claims against it pursuant to Fed.R.Civ.P. 12(b)(1). Since the Loughlins and Glenbrook–Brandt are asserting jurisdiction under the FTCA, they bear the burden of establishing it. *Rhoades*, 950 F.Supp. at 627. That burden is a lesser one than the one which must be met at trial. *Koch v. United States*, 814 F.Supp. 1221, 1226 (M.D.Pa.1993) (citing *Mortensen*, 549 F.2d at 891–92). The government will only prevail if "material jurisdictional facts [are] not in dispute and [the government is] entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991).

## A. Statute of Limitations

The government argues that this Court lacks subject matter jurisdiction because the Loughlins' claims and Glenbrook–Brandt's cross-claims are barred by the FTCA's statute of limitations. 28 U.S.C. § 2401(b). Before a lawsuit may be filed under the FTCA, an administrative claim must be presented to the government. 28 U.S.C. § 2675. Failure to file such a claim within two years of its accrual bars suit against the United States. 28 U.S.C. § 2401(b). Thus, the issue before the Court is whether the Loughlins' claims and Glenbrook–Brandt's cross-claims against the government accrued more than two years prior to filing their administrative claims.[12]

Moreover, as noted above, the government's jurisdictional challenge is "inextricably intertwined" with the merits of the Loughlins' claims and Glenbrook–Brandt's cross-claims, for the government is asking this Court to determine when plaintiffs' and cross-claimant's claims accrued for purposes of 28 U.S.C. § 2401(b). Therefore, if the Court were to "weigh and resolve" the disputed jurisdictional facts,

the cases which explicate the standard to apply in a FTCA action where defendant challenges the Court's subject matter jurisdiction under Rule 12(b)(1) on the basis that the plaintiff has not timely complied with the FTCA's statute of limitations. *See, e.g., Augustine v. United States*, 704 F.2d at 1076, 1079; *Osborn v. United States*, 918 F.2d 724, 728 (8th Cir.1990); *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir.1986).

**12.** Of the Glenbrook–Brandt defendants, only Brandt, Inc. filed an administrative claim.

"the Court would, in essence, force plaintiffs to engage and prevail in at least two trials before becoming eligible for a remedy. Initially, and perhaps before discovery was complete, plaintiffs would have to prove to the Court the United States was negligent to show jurisdiction is proper; later, to obtain a remedy, plaintiffs would have to prove their case again." *Rhoades,* 950 F.Supp. at 629. Consistent with relevant case law which addresses jurisdictional challenges that are intertwined with factual issues that go to the merits (*see supra* note 11), the Court will treat the government's motions as ones for summary judgment, since the claims of the plaintiffs and cross-claimant are not "clearly insubstantial or immaterial," and thus, dismissal under Rule 12(b)(1) would not be appropriate. Applying this standard, the Court must deny the government's motions because there are significant facts in dispute that preclude a finding that the statute of limitations bars the claims of the plaintiffs and of the cross-claimant. However, before addressing these factual issues, the Court must digress to decide the government's argument that the Loughlins' administrative complaint was not validly filed until February 15, 2001.

## 1. When Did Plaintiffs File their Administrative Claims?

The government suggests that the Loughlins' claim is barred because their prior administrative claim, filed by their attorney on January 11, 2001, did not include an authorization of the attorney's right to file suit on behalf of the plaintiffs as required by federal regulation. (*See* U.S. Def.'s Mem. at 25 n. 11.) [13]

■ A majority of circuits that have considered the issue—including this Circuit—have found that an administrative claim is jurisdictionally adequate if the claimant files "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum-certain damages claim." *GAF Corp. v. United States,* 818 F.2d 901, 919–20 (D.C.Cir.1987). "Claimants who discharge this obligation of notice have satisfied the jurisdictional requirements of the Act, and, with the running of the six-month period Congress has provided the agencies to make final disposition of claims presented, are entitled to file suit." *Id. See also Knapp v. United States,* 844 F.2d 376, 379 (6th Cir.1988) ( "[T]he regulations contained in 28 C.F.R. §§ 14.1—14.11 'govern administrative settlement proceedings; they do not set federal jurisdictional prerequisites.' ") (citing *Douglas v. United States,* 658 F.2d 445, 447–48 (6th Cir. 1981)); *Warren v. United States Dept. of Interior Bureau of Land Mgmt.,* 724 F.2d 776, 778 (9th Cir.1984) (finding that "Congress did not intend to treat regulations promulgated pursuant to section 2672 as jurisdictional prerequisites under section 2675(a)" and adopting the two-step test for presentment of a claim); *Adams v. United States,* 615 F.2d 284, 289 (5th Cir.1980) (adopting the two-step test for presentment of a claim). Given the plethora of authority contradicting the government's position (*see* Pls.' Opp. at 31–33), it must be concluded that the Loughlins filed a valid administrative claim on January 11, 2002.

---

13. A Department of Justice regulation related to the filing of administrative claims under the FTCA, states that for statute of limitations purposes "a claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative ... [a] written notification of an incident, accompanied by a claim for money damages in a sum certain ... and the title or legal capacity of the person signing, and is accompanied by evidence of his authority to present a claim on behalf of the claimant." 28 C.F.R. § 14.2(a).

## 2. Accrual of Claims

Glenbrook–Brandt filed its administrative claim on February 9, 2001, and argues that its claim accrued either in April 2000, when its counsel was told for the first time of the unacceptable levels of arsenic on the property at a meeting with a Corps representative, or alternatively, in June 2000 when the Corps issued a draft written finding about the arsenic contamination. (Glenbrook–Brandt Defs.' Opp. Ex. 13.) As noted above, the Loughlins filed their administrative claim on January 11, 2001, and argue that their claim accrued no earlier than February 10, 1999, when they wrote to Glenbrook–Brandt invoking the buyback provision of the 1994 Indemnification Agreement.

In contrast, the government alleges that neither Glenbrook–Brandt nor the Loughlins filed their administrative claims within two years of the accrual of their claims. The government alleges that Glenbrook–Brandt became aware of contamination on the 4825 property in May 1992, when its construction workers suffered burning in their eyes and lungs and noticed strong odors. (U.S. Def.'s Mem. to Dismiss Cross–Cl. at 26.) Alternatively, the government argues that the Indemnification Agreement indicates that Glenbrook–Brandt was aware of the contamination in March 1994. (*Id.* at 26.) With respect to the Loughlins' claim, the government argues that the statute of limitations began running in March 1994 when the Loughlins purchased 4825 Glenbrook, or at the latest in December 1998, when they met with representatives from the Army to discuss the investigation of their property. (U.S. Def.'s Mem. at 22.) Given the law and facts set forth below, the issue of when the claims accrued involves disputed issues of fact that cannot be resolved at this early stage. Consequently, the government's motions must be denied.

The statute of limitations provision of the FTCA is interpreted by reference to federal law. *See Sexton v. United States*, 832 F.2d 629, 633 n. 4 (D.C.Cir. 1987). In *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the Supreme Court held that under the FTCA, "[a] claim accrues within the meaning of § 2401(b) when the plaintiff knows both the existence and the cause of his injury." *Id.* at 120, 100 S.Ct. 352. The practicality of discovering the injury is an important consideration in determining when a claim accrues. The "discovery rule" provides that a "cause of action accrues when the injured party discovers— or in the exercise of due diligence should have discovered—that it has been injured." *Sprint Communications Co. v. Federal Communications Comm'n*, 76 F.3d 1221, 1228 (D.C.Cir.1996). Thus, FTCA claims involving contamination or damage to real property accrue when the plaintiff discovers or should have discovered contamination on his property.

For example, in a dispute over an easement granting the Fish and Wildlife Service ("FWS") access to maintain wetlands on plaintiff's farm, the court held that the statute of limitations was triggered when abnormal levels of flooding actually damaged the property as a result of FWS's construction, not when the FWS first completed its construction. *Lhotka v. United States*, 114 F.3d 751, 753 (8th Cir.1997). The court found that "if the Lhotkas had brought suit immediately after the work was completed ... the trial court would have then dismissed the action for failure to state a claim: at that time, both the fact of injury and its cause were simply too speculative for a court to provide any remedy." *Id.* at 753. *See also Bartleson v. United States*, 96 F.3d 1270, 1277 (9th Cir.1996) (FTCA claim accrues upon discovery of the physical cause of the injury to the property); *McLellan Highway Corp. v. United States*, 95 F.Supp.2d 1, 14

(D.Mass.2000) ("FTCA claim accrues upon plaintiffs' discovery of the physical cause of the injury to the property") (citing *Dyniewicz v. United States,* 742 F.2d 484, 486–87 (9th Cir.1984)); *Santa Fe Pacific Realty Corp. v. United States,* 780 F.Supp. 687, 693 (E.D.Cal.1991) (FTCA claim accrued when plaintiffs knew or should have known of hazardous waste site on their property); *Warminster Township Mun. Auth. v. United States,* 903 F.Supp. 847, 850–51 (E.D.Pa.1995) (FTCA's statute of limitations begins to run when plaintiff discovers the presence of hazardous substances in its well).

However, a claimant may not wait passively until evidence of actual injury surfaces. "Once the prospective plaintiff is on notice that it might have a claim, it is required to make a diligent inquiry into the facts and circumstances that would support that claim." *Sprint Communications,* 76 F.3d at 1228. "[T]he statute of limitations begins to run on the first date that the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." *Zeleznik v. United States,* 770 F.2d 20, 23 (3d Cir.1985).

■■ Applying these principles to this case requires a precise definition of the injury that serves as the basis of the claim. While the government would like the limitations period to be triggered by the discovery of any foreign substance, including Silvex, or the discovery of contamination on the property of others, such an overly expansive definition of injury cannot be reconciled with the relevant case law. Rather, the pertinent injury to the Loughlins and Glenbrook–Brandt is the contamination *of the 4825 property.* The relevant inquiry, then, is at what point these parties were sufficiently aware, or could with diligent inquiry have become aware, of this contamination on their property and its cause. While the limitations period begins to run even if the claimant does not know the full extent of the injuries, *see Sprint Communications,* 76 F.3d at 1228, the claimant must have sufficient knowledge to know that an injury has occurred. Consequently, where the injury is contamination to the 4825 property, knowledge of contamination a mile away or on neighboring property or the discovery on the property of buried containers or Silvex, as opposed to a hazardous contaminant, does not trigger the limitations period.

3. Awareness of the Injury in 1992 – 1994

Despite the government's assertion, the evidence that Glenbrook–Brandt or the Loughlins were aware of contamination on the 4825 property during this time period is not undisputed. While the 1992 construction incident put Glenbrook–Brandt "on notice" that a wrong may have been committed, Glenbrook–Brandt fulfilled its obligation to investigate the possibility of an injury. Glenbrook–Brandt notified AU and AU retained EMS to inspect and analyze the property. EMS conducted two sets of tests, neither of which indicated the presence of unacceptable or dangerous levels of chemical substances. EMS only identified the presence of Silvex and explained that while Silvex is irritating to the senses, it is not hazardous. In fact, the report provided by EMS emphasized the effect of Silvex on "aquatic life" and indicated no other hazards on the property. (June 4, 1992 Letter, U.S. Def.'s. Mem. Ex. 10.) At this point, there was a plausible explanation for the workers' injuries that did not suggest the presence of the extensive contamination that was later disclosed in 1999. Glenbrook–Brandt attempted to remedy the problem identified by the EMS reports by removing the Silvex, and it was concluded that there was no lasting impact from the presence of Silvex once the situation was remediated.

Further, nothing in the 1994 Indemnification Agreement or Glenbrook–Brandt's answer to the complaint indicates knowledge of contamination of the 4825 property. The Indemnification Agreement references information about the 1992 construction worker incident and its aftermath. Moreover, the revelation in the draft Indemnification Agreement, described in Glenbrook–Brandt's answer to the underlying complaint, that "bottles and a 50–gallon drum trash can which may have contained Hazardous Substances ... and other potentially hazardous or harmful material" (Brandt Answer ¶ 137) were discovered on the property does not indicate sufficient awareness of contamination of the property to trigger accrual of a claim. As in *Lhotka*, at this point "the fact of injury and its cause were simply too speculative for a court to provide any remedy." *Lhotka*, 114 F.3d at 753. Similarly, in *Bartleson v. United States*, plaintiffs filed an FTCA claim for dimunition in property value due to artillery shells from an adjacent military reservation landing on plaintiffs' properties. While artillery shells hit plaintiffs' properties as early as 1970, the claim did not accrue until 1989 when shelling became so frequent that it became incumbent on owners to disclose the shelling problem to those who would acquire an interest in their properties. *Bartleson*, 96 F.3d at 1277. Prior to this point, there was not a sufficient basis to assert that an injury had occurred.

The government also points to a diagram in the Corps' *Draft Field Sampling Plan for Hazardous and Toxic Waste, Spring Valley Project* depicting two munitions shell pits adjacent to the 4825 property as evidence of contamination. (Defendant United States' Consolidated Reply to the Opposition to United States' Motion to Dismiss their Cross–Claims Brought Under the Federal Tort Claims Act ["U.S. Def.'s Consol. Reply"] at 4.) Glenbrook–Brandt notes in its answer that its counsel forwarded the *Draft Field Sampling Plan* to the Loughlins on March 13, 1994. (Answer ¶ 138.) The Loughlins' assert that they never saw or received the plan. (Loughlin Aff. ¶ 18.) Moreover, the diagram does not indicate the presence of the injury, *i.e.*, contamination on the 4825 property. First, the munitions pits were *adjacent to* not *on* the 4825 property. Second, the existence of munitions pits— which were constructed to test, not bury, explosives—does not necessarily indicate the presence of buried contaminants. This knowledge does not amount to the requisite level of awareness of contamination and its resulting injury to the Loughlins' property to trigger the limitations period, for awareness of a potential source of contamination is simply not enough. *See Crawford v. Boyette*, 121 N.C.App. 67, 464 S.E.2d 301, 304 (1995) (claim accrued when test results for contamination were positive, not when plaintiff learned neighbor's well was contaminated; "mere suspicion of contamination" will not trigger the limitations period); *Kalik v. Allis–Chalmers Corp.*, 658 F.Supp. 631, 636 (W.D.Pa.1987) (claims against manufacturer of PCB electronics did not accrue until the discovery of the contamination, even though there had been prior proceedings brought against plaintiff for the improper storage and handling of the PCBs).

Similarly, the Loughlins' knowledge about the property was certainly no better than Glenbrook–Brandt's. In addition, after the Loughlins learned of the materials that had been found on their property in 1992 by the construction workers and of the EMS results, they too hired an independent testing organization, ECS, to "gain assurance that the 4825 property had been fully cleaned up." (Loughlin Aff. ¶ 10.) The ECS report, dated March 17, 1994, was assuring, since it concluded:

> Based on our review of the test results from this study and a review of the test

results contained in the American University study in conjunction with the grading information for the site, it is our professional opinion that the residential lot at 4825 Glenbrook Road has not been impacted by contamination from hazardous materials.

(U.S. Def.'s Mem. Ex. 20.)

In the face of these findings by two independent expert testing organizations that no hazardous substances had been found on the land, the government cannot seriously assert that the Loughlins had knowledge of an injury at this stage. Moreover, the Loughlins' belief that a landscaping shed, storing chemicals and equipment, once existed on the property provides a plausible explanation for the discoveries. (Loughlin Aff. ¶ 8.) Finally, while the Loughlins' decision to protect themselves in the event of the discovery of hazardous substances by entering into an Indemnification Agreement demonstrates an understanding of a possible risk, it does not constitute awareness of the relevant injury sufficient to trigger accrual of their claim.[14] Both the Loughlins and Glenbrook–Brandt were diligent in investigating the condition of the 4825 property and they cannot be faulted for not testing the land themselves since it was necessary to rely on experts' advice. *See Lhotka v. United States*, 114 F.3d at 753 (finding that 28 U.S.C. § 2401 did not bar plaintiff's claim because plaintiffs were "neither engineers nor hydrologists" and could not therefore be reasonably expected to evaluate the latent water damage on their property.)

Given this evidence, it is impossible to conclude as a matter of law that the statute of limitations was triggered in either 1992 or 1994.

### 4. Awareness of Injury in 1996–1998

■ The government proceeds to argue that even if the Loughlins' claim did not accrue in 1994, they were fully aware of the injury by the end of 1998, when the Corps notified them that it was intending to investigate their property, and at a meeting arranged by the Corps, Kathi Loughlin expressed concern about the safety of her children playing in the yard. (U.S. Def.'s Mem. at 24.) At that time, the government asserts, environmental testing had been taking place in the neighborhood for a number of years. (*Id.*) However, the Corps' notification to the Loughlins did not indicate that their property was contaminated. Rather, it suggested the opposite—"we would like to conduct investigations which will allow us to confirm the absence of buried munitions, remnants thereof, and associated material" on your property. (U.S. Def.'s Mem. Ex. 26.) Considering that two previous private investigations, as well as several government tests of the property, had found no contamination,[15] such seemingly opaque wording—emphasizing the likelihood that no

---

**14.** In fact, an EPA test performed on the 4825 Glenbrook property in March 1994 showed an elevated level of arsenic in one sample (U.S. Def.'s Stat. ¶ 39; U.S. Def.'s Mem. Ex. 8, Table 3), but the Loughlins and Glenbrook–Brandt aver that they were not told of this elevated sample at that time. (Loughlin Aff. ¶ 22; Glenbrook–Brandt Defs.' Mem. at 7.)

**15.** In 1995, the plaintiffs' received a letter from the Corps stating that after extensive testing, it had determined that "no hazard to human health or to the environment exists" in the region investigated, which included the plaintiffs' property. (Pls.' Opp. to U.S. Def.'s Mot. Ex. H.) Similarly, the Corps' June 2, 1995 ROD states that "there are no risks posed by hazardous substances that exceed acceptable risk levels for human health or the environment." (Glenbrook–Brandt Defs.' Mem. Ex. 16.) In addition, after potential disposal pits were found at 4801 Glenbrook, next door to the Loughlins' residence, a letter from the Corps to the Spring Valley commu-

contamination existed—hardly provides fair notice of extensive contamination. Nor does Kathi Loughlin's natural concern for her children's safety alter this conclusion. Moreover, the Loughlins assert that at the meeting they were told by the Corps representatives that "the focus of the Corps' investigation would be on the excavation of suspected pits" on the adjacent property of the Korean Ambassador. (Loughlin Aff. ¶ 30.) At no time did the Corps representatives "indicate that they were concerned about or suspected the presence of chemicals or munitions" on the 4825 property. (*Id.* ¶ 31.) The fact that the Corps was not planning to evacuate the Loughlins from their home during the investigation (*id.* ¶ 30) reinforced this lack of concern. Finally, the Loughlins' claim that they were unaware of the hazardous substances, including arsenic, which were found in front of the AU President's house at 4835 Glenbrook (next door to the Loughlins' residence) in June of 1996. (*Id.* ¶¶ 24–28.) Determining the accuracy of this claim at this stage would be inappropriate. Moreover, the continuous assurances by the government that there was no danger to the community by the discovery of contamination on other properties greatly weakens the importance of the discoveries at 4835 and 4801 Glenbrook.

In support of its argument, the government relies on *Muth v. United States,* 1 F.3d 246 (4th Cir.1993). However, this reliance is unavailing. In *Muth,* the plaintiff sued the government for the diminution in the value of his land due to "contamination of surrounding and adjacent properties." *Id.* at 249. Although the government documented contamination of the adjacent properties as early as 1986, and Muth wrote letters to the Corps and the EPA as early as 1988 stating that the

value of his land had been drastically reduced by the contamination, Muth failed to file a claim until 1991. *Id.* at 247–49. The district court found that Muth's claim was barred by the statute of limitations, and the Fourth Circuit affirmed. The court found that "correspondence between appellant and others ... demonstrates unequivocally that appellant had first-hand knowledge of both his injury, and the cause thereof, at the latest in February 1989," *id.* at 250, and that plaintiff failed to undertake diligent investigation to determine if he had a claim against the United States. *Id.* at 251.

The facts of *Muth* are easily distinguishable from the instant case. In *Muth,* the court found that the relevant injury was the diminution in the value of his property that resulted from contamination of surrounding properties and that plaintiff admitted his knowledge of the existence of this injury more than two years before he filed suit. In this case, the Loughlins and Glenbrook–Brandt seek damages for the injury to their own property, and in the case of the Loughlins, to their health. Since their claims are not based on the contamination of adjacent property, as Muth's was, their knowledge of contamination of a neighbor's property is not fatal to their claims.

In sum, plaintiffs and cross-claimant have sustained their burden of establishing subject matter jurisdiction under the FTCA in response to the government's statute of limitations challenge. A reasonable jury could find that it was not until after February 10, 1999 (when the Loughlins provided notice pursuant to the Indemnification Agreement to Glenbrook–Brandt)—and less than two years prior to filing their administrative claims—that the Loughlins and Glenbrook–Brandt [16] knew

---

nity on April 20, 1998 stated that "this area poses no threat to public health while it re-

mains undisturbed." (U.S. Def.'s Mem. Ex. 35.)

**16.** In addition, Glenbrook–Brandt asserts that

or should have known of the contamination at 4825 Glenbrook.[17] Thus, contrary to the government's contention, the undisputed facts do not support an argument that the extent of the Loughlins' and Glenbrook–Brandt's knowledge as of 1994 or that of the Loughlins as of 1998 regarding contamination of the 4825 property was sufficient to trigger the FTCA's two-year limitations period. Given the issues of fact in dispute, the government cannot prevail as a matter of law at this stage, and its motions to dismiss based on the statute of limitations must be denied.

### B. Analogous Private Liability

Congress has provided that the United States is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, thus establishing that "the United States cannot be held liable when there is no comparable cause of action against a private citizen." *C.P. Chemical Co. v. U.S.*, 810 F.2d 34, 37 (2d Cir. 1987). *See also Feres v. United States*, 340 U.S. 135, 141, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (holding that 28 U.S.C. § 2674 limits liability to "circumstances that would bring private liability into existence"). The government argues that the Court lacks subject matter jurisdiction over the Loughlins' claims and Glenbrook–Brandt's cross-claims because no analogous private liability can be demonstrated. Specifically, the government argues that it owes no duty to a subsequent purchaser of land "because a private party could not be held liable under such a scenario." (U.S.

Def.'s Mem. at 13–14.) The government's argument is legally flawed.

■ The government misconstrues the purpose of the analogous private liability requirement and mistakenly uses this requirement in an effort to prematurely raise its factual defenses. The government's attempt to conflate the merits of the case with the requirement of analogous private liability must be rejected for that requirement only ensures that the plaintiff's allegations, if assumed to be accurate, state a claim under local law.

> [F]or liability to arise under the FTCA, a plaintiff's cause of action must be "comparable" to a "cause of action against a private citizen" recognized in the jurisdiction where the tort occurred ... and his allegations, *taken as true*, must satisfy the necessary elements of that comparable state cause of action ...

*Chen v. United States*, 854 F.2d 622, 626 (2d Cir.1988) (quoting *C.P. Chemical*, 810 F.2d at 37) (emphasis added). Subject matter jurisdiction is lacking, then, when no local law could reasonably apply to the government action alleged in the complaint. The requirement therefore prevents a tort suit against the government when local laws are clearly inapplicable, for instance, in cases involving administrative action or other matters in which alternative procedures for appeal exist and the tort system is an inappropriate framework for seeking relief. *See, e.g., Jayvee Brand, Inc. v. United States*, 721 F.2d 385

they could not file a FTCA claim until they resumed ownership of the property on September 5, 2000. *See* 28 C.F.R. § 14.3 (a claim for injury to or loss of property may be presented only by the owner of the property or his duly authorized agent or legal representative).

17. Since both parties filed by February 10, 2002, it is not important to pinpoint the exact

date when the limitations period started to run. Therefore, the Court need not determine, as argued by Glenbrook–Brandt, that the two-year period began in either April 2000 or June 2000 when the government finally disclosed testing results that revealed an "unacceptable hazard from arsenic" on the property. (Glenbrook–Brandt Defs.' Opp. at 12–13 and Ex. 13.)

(D.C.Cir.1983) (no analogous private liability for failure of Consumer Product Safety Commission to follow agency filing procedures); *United States v. Agronics Inc.*, 164 F.3d 1343 (10th Cir.1999) (no analogous private liability for unauthorized division of regulatory jurisdiction between two administrative agencies); *Chen*, 854 F.2d at 623 (no analogous private liability for violation of the government's federal procurement duties); *Akutowicz v. United States*, 859 F.2d 1122 (2d Cir.1988) (no analogous private liability for allegedly wrongful revocation of citizenship); *Appleton v. United States*, 180 F.Supp.2d 177 (D.D.C.2002) (no analogous private liability for capricious exercise of power by the Bureau of Alcohol Tobacco and Firearms in reviewing an application).

█ Contrary to the government's argument, the instant claims easily satisfies the analogous private liability requirement. The conduct in question is not the "quasi-legislative or quasi-adjudicative action of a government agency," *Jayvee*, 721 F.2d at 392, and as alleged in the complaint, it may be analogized to private action; a private citizen who buries hazardous chemicals in land he later sells to an unwitting buyer can be sued in tort. In fact, the Court has already ruled on this very issue in response to AU's motion to dismiss and has found, consistent with the Restatement (Second) of Torts § 353, that AU had a duty to warn subsequent property owners of a dangerous condition on the 4825 prop-

erty. *Loughlin v. United States*, 209 F.Supp.2d at 170–72. *See also W.C. & A.N. Miller Cos.*, 963 F.Supp. at 1244.[18] In view of these rulings, there can be no argument that the analogous private liability requirement has not been met.[19]

## II. Assumption of Risk

█ Alternatively, the government has moved for summary judgment on the ground that the Loughlins assumed the risk of the harm that forms the basis for their claims. The doctrine of assumption of risk can be used to bar recovery for a negligent act when a plaintiff has voluntarily incurred a known risk. *See Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C.1980) ("[a]ssumption of risk is an available defense when a plaintiff has incurred a known risk"); *Green v. United States*, 991 F.Supp. 15, 18 (D.D.C.1998) ("the doctrine of assumption of risk, which applies when a plaintiff has voluntarily incurred a known risk ... precludes recovery of damages"). *See also* Restatement (Second) of Torts §§ 496A, 496C cmts. b, f.

Assumption of risk is a subjective inquiry; it applies "only when the party actually knows the full scope and magnitude of the danger and thereafter voluntarily exposes himself to it." *Piedmont v. Johnston*, 999 F.Supp. 34, 57 (D.D.C.1998). *See also Jarrett v. Woodward Bros., Inc.*, 751 A.2d 972, 986 (D.C.2000) ("assumption of risk is applied only where 'the plaintiff ...

---

**18.** Moreover, there is a serious question whether this argument provides any basis for dismissal, for as recognized by the United States Court of Appeals for the District of Columbia:

> Very few decisions even mention the private liability requirement and we have found no decisions that rely solely on such requirement ... in holding the government immune from suit ... most cases simply quote the private liability requirement of § 1346(b) and then proceed to rely upon the Act's discretionary function exception

.... Therefore, we reject the government's reliance on the private liability requirement.

*Wells v. United States*, 851 F.2d 1471, 1473–4 (D.C.Cir.1988).

**19.** Moreover, the cases cited by the government do not support such a challenge. They merely state the rule that without analogous private liability, there is no subject-matter jurisdiction over an FTCA claim. (*See* U.S. Def.'s Mem. to Dismiss Cross–Cl. at 30.)

subjectively know[s] of the existence of the risk and appreciate[s] its unreasonable character' ") (quoting *Sinai v. Polinger Co.*, 498 A.2d 520, 524 (D.C.1985)); Restatement (Second) of Torts § 496D ("a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character").

■ "The standard [for proving assumption of risk] is heavily fact-based, and summary judgment based on assumption of risk should therefore be granted only if no real dispute exists as to the plaintiff's awareness of the relevant danger." *Maalouf v. Swiss Confederation*, 208 F.Supp.2d 31, 42 (D.D.C.2002). Here, there is such a dispute. The Loughlins deny that they were fully aware of the risks associated with the property when they purchased it and the knowledge the government attempts to impute to the Loughlins goes far beyond the undisputed facts before the Court. While the Loughlins knew that laboratory equipment, containers and Silvex were removed from their property in May 1992 during construction of their home, this information cannot be equated with knowledge of "the full scope and magnitude of the danger." *Piedmont*, 999 F.Supp. at 57.

For instance, the Loughlins deny that they were aware of the source of the equipment and containers, and they disclaim any knowledge of any hazardous materials being buried on their property other then Silvex, which they were assured was not detrimental to their health and had been removed in 1992. Moreover, the investigations by EMS and ECS, which the government cite to prove the Loughlins' knowledge of contamination, did no such thing. On the contrary, the only contamination revealed by these tests was Silvex. Consequently, the tests only served to reassure the Loughlins that their

property was safe. Further, the fact that the Loughlins entered into an Indemnification Agreement to protect themselves in the event that government testing revealed contamination was merely a precaution and not evidence that the Loughlins knew that the property was contaminated. Based on their awareness of the Silvex and buried containers, the Loughlins could not anticipate, no less appreciate, the risk of contamination that was eventually revealed. The discovery of arsenic contamination introduced a "new element" that transformed the situation "from one whose risks were more or less known into one whose potentialities" plaintiff could not, or at least may not, have anticipated. *Sinai*, 498 A.2d at 524–25 (finding that plaintiff did not assume risk of being shot when he pursued assailant after an altercation because he did not know his assailant was armed). Given this limited evidence of knowledge, there is no basis for concluding that the Loughlins voluntarily assumed a known risk or that they could have appreciated its dangerousness.

Moreover, the risk of contamination is not an "obvious risk" like "the danger of slipping on ice, of falling through an unguarded opening, [or]of lifting heavy objects" "that anyone of adult age must be taken to appreciate." *Reid v. Washington Overhead Door, Inc.*, 122 F.Supp.2d 590, 595 (D.Md.2000) (finding that plaintiff assumed obvious risk when removing a stick propping open a heavy door). In fact, despite their efforts, the Loughlins could not detect any risk of contamination on their property. Instead they properly relied on experts who informed them that there was no contamination. In contrast, the plaintiff in *Green*, a case relied on by the government, assumed an obvious risk of being hit by a moving vehicle by walking on the side of a busy roadway and by stepping suddenly into the road without checking for oncoming traffic. *Green*, 991

F.Supp. at 17–18. But here, given plaintiffs' effort to discover any possible danger and the persistent assurances they received both from the government and the experts who analyzed the property, the risk they faced could hardly be called obvious.[20]

It is thus not reasonable to argue that the Loughlins understood "the full scope and magnitude" of the contamination on their property or voluntarily exposed themselves to this danger. The government's motion on the basis of assumption of the risk must be denied.

### III. Glenbrook–Brandt Defendants' Motion for Summary Judgment

Glenbrook–Brandt has moved for summary judgment with respect to the Loughlins' claim that Glenbrook–Brandt knew or should have known that the 4825 property contained highly dangerous munitions, highly toxic chemical warfare agents, and poisons but failed to disclose the information to the Loughlins prior to their purchase of the property. The basis for Glenbrook–Brandt's motion is two-fold. First, Glenbrook–Brandt asserts that the Loughlins were aware at that the time of the sale that the property was potentially contaminated, and second, it made full disclosure of its knowledge of the possible contamination on the 4825 property.[21]

Glenbrook–Brandt's duty to warn the Loughlins of the hazardous condition of the property stems from the parties' vendor-vendee relationship with respect to the 4825 property. Generally, "a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession." Restatement (Second) of Torts § 352. However, as this Court has recognized, section 353 of the Restatement sets forth an exception to this principle:

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

*Loughlin v. United States,* 209 F.Supp.2d at 170–71 (citing Restatement (Second) of Torts § 353). "Under section 353, a ven-

---

**20.** *Green* is also distinguishable in that judgment was entered after a bench trial rather than on a motion for summary judgment prior to any discovery being taken. 991 F.Supp. at 17.

**21.** Glenbrook–Brandt appears to concede that disputed issues of fact exist with respect to plaintiffs' actual knowledge of contamination and that plaintiffs are entitled to discovery regarding this issue. (Glenbrook–Brandt Defendants' Reply to Plaintiffs' Opposition to Motion for Summary Judgment ["Glenbrook–Brandt Defs.' Reply"] at 2.)

dor's liability turns on both the vendee's knowledge of the dangerous condition and the vendor's own actions in concealing or merely failing to reveal the condition. Both of these elements are questions of fact." *Id.* at 171. Liability is also dependant on whether the parties "had reason to know" of the hazards or risks. Restatement (Second) of Torts § 353(1).

What the Loughlins and Glenbrook–Brandt knew with respect to the contamination of the property and whether Glenbrook–Brandt failed to disclose or actively concealed information are material issues of fact that are disputed. *See Pipher v. Odell,* 672 A.2d 1092 (D.C.1996) (denying summary judgment where there were genuine issues of material fact as to whether the defendant/seller was aware of and failed to warn plaintiffs of rat infestation on property); *HRW Systems v. Washington Gas Light Company,* 823 F.Supp. 318, 351–52 (D.Md.1993) (denying summary judgment where "determination of the knowledge of both plaintiffs and defendants is crucial" but cannot be made by the court at this stage in the proceedings).

The Loughlins allege that Glenbrook–Brandt knew of, failed to disclose, and concealed the existence of inherently dangerous and highly toxic buried munitions, chemical agents and poisons buried on the 4825 property. (Compl.¶¶ 66–67, 73–74, 83–84, 98, 118.) In response, Glenbrook–Brandt counters that the Loughlins were fully aware of the potential contamination of the 4825 property, citing their demand for an Indemnification Agreement prior to settlement, the Loughlins' affidavits, and the ECS report. (Glenbrook–Brandt Defs.' Mem. at 13–14.)[22] However, a care-

ful examination of these materials reflects far less knowledge by the plaintiffs, thus negating the argument that the Loughins knew or had reason to know of the condition of the property.

■ First, the Indemnification Agreement indicates that "certain materials had been found upon excavation of the property, which *may* have contained Hazardous Substances" (U.S. Def.'s Mem. Ex. 18 (emphasis added)), but does not reveal the fact, which plaintiffs claim they were not informed about (Loughlin Aff. ¶ 14), that the construction workers suffered injuries requiring hospitalization as a result of their exposure to the materials uncovered. The Agreement also states that the "[m]aterial may be related to past operations of agencies of the United States Government" (*id.*), but does not indicate that the past operations consisted of the development, testing, and burial of conventional and chemical weapons by the Army. Rather, plaintiffs argue that they had been told that the property had been the site of a landscaping shed in which landscaping chemicals and equipment had been stored. (Loughlin Aff. ¶ 8.) Similarly, the Agreement notes that analysis of the soil, in response to the discovery of buried materials, by a "consultant" revealed the presence of the herbicide Silvex, "at levels which would not present a health or environmental hazard." (U.S. Def.'s Mem. Ex. 18.) As Silvex was once commonly used in land and garden maintenance, its presence supported the explanation that the contamination and materials previously unearthed were related to the prior existence of a landscaping shed on the property. By

---

**22.** In this regard one cannot but note the irony in Glenbrook–Brandt's position. While Glenbrook–Brandt vigorously opposes the government's motion to dismiss its cross-claims on statute of limitations grounds, arguing that it was unaware of the potential contamination on the 4825 property, it inex-

plicably argues here that the Loughlins' knowledge, which could hardly be more extensive then Glenbrook–Brandt's, is sufficient to result in a dismissal of their claims against Glenbrook–Brandt. (*See* Glenbrook–Brandt Defs.' Opp. at 21–25.)

lumping together distinct sources of contamination and inferring that the Loughlins' awareness of Silvex constitutes full knowledge of the presence of highly toxic chemical agents and poisons on the 4825 property, Glenbrook–Brandt does exactly what it so roundly criticizes the government for doing. (*See* Glenbrook–Brandt Defs.' Opp. at 22 ("government makes no effort to distinguish the types of contamination involved, hoping that this court will lump all environmental conditions together for statute of limitations purposes.").)

In addition, while the Indemnification Agreement indicates that government agencies were conducting additional soil analysis to "determine whether any Material may pose a risk to human health or the environment," the Loughlins and Glenbrook–Brandt deny that they were told at the time of any adverse findings. Nor does the Draft Indemnity Agreement (Glenbrook–Brandt Defs.' Mem. Ex. 10) serve to support Glenbrook–Brandt's claim that plaintiffs had knowledge of hazardous contaminants on the property. While it, like the final Agreement, discloses the possibility that hazardous materials might be located on the property and the possible need for "corrective actions pertaining to munitions and other hazardous materials in the area and on the property" (*id.*), it cannot be inferred from this language, given the facts relating to the discovery of Silvex and the facts described in the Loughlin affidavit, that plaintiffs understood that their property was contaminated with hazardous chemical agents that had been buried there by the government over seventy years before. Similarly, the Loughlins' awareness of a munitions bunker one mile from the 4825 property (Loughlin Aff. ¶ 11) is not sufficient to establish that they had knowledge that dangerous munitions or toxic chemical agents were buried on the 4825 property.

■ Finally, Glenbrook–Brandt's use of the ECS report that was prepared for the Loughlins, is, at best, misleading. ECS's statement that "there is some concern that some contamination may exist around this residence" is not a conclusion, but an inference based on their "understanding" that the "general vicinity of this residential lot was apparently used in munitions testing in the early part of this century." (Glenbrook–Brandt Defs.' Mem. Ex. 13.) These statements provide contextual background information rather than a definitive finding or assessment. In contrast, ECS concludes that "the residential lot at 4835 Glenbrook Road has not been impacted by contamination from hazardous materials." (*Id.*) Contrary to Glenbrook–Brandt's assertion, the ECS report does not establish that the Loughlins had knowledge of the potential for contamination, but rather, it provides the Loughlins with an assurance that the 4825 property was not contaminated. The ECS conclusion, thus, reinforced the results of the 1992 investigation by EMS, which is referenced in the Indemnification Agreement and which found only Silvex.

Moreover, a determination of Glenbrook–Brandt's liability does not hinge solely on how much the Loughlins knew about potential or actual contamination on the 4825 property, but rather, the question is whether Glenbrook–Brandt made full disclosure of what it knew. If Glenbrook–Brandt had superior knowledge of contamination—potential or actual—plaintiffs' claim for failure to disclose would have to survive. In this regard, the Loughlins have proffered evidence that Glenbrook–Brandt did, indeed, have superior knowledge—particularly with respect to the details of the government's prior use of the property and the events surrounding the 1992 discovery of buried materials on the 4825 property. (Pls.' Opp. to Glenbrook–Brandt's Mot. at 8.) But more importantly,

the Loughlins point to recently discovered evidence that suggests that Glenbrook–Brandt may have actively concealed the presence of dangerous munitions that it unearthed during construction. (Plaintiffs' Opposition to Defendant Glenbrook–Brandt's Motion for Summary Judgment ["Pls.' Opp. to Glenbrook–Brandt Mot."] at 2.) Recent excavation and investigation of the 4825 property by the Corps has revealed that a retaining wall, built at the time the house was built, covered a burial pit containing a large cache of munitions, bottles and a 55 gallon drum. The footer of the retaining wall was over five feet thick and had been free-poured. In fact, during a February 19, 2002 meeting with the Spring Valley community, a representative of the Corps discussed the retaining wall, the burial pit and other materials uncovered, and stated "[w]e're not the first ones, even in the last decade, to have dug up some of this stuff." (Minutes of February 19, 2002 Meeting, Pls.' Opp. to Glenbrook–Brandt's Mot. Ex. D.) Given this evidence, the Loughlins correctly suggest that Glenbrook–Brandt knew of the chemical munitions and burial pit and built the retaining wall during the construction of the 4825 property in order to conceal them. (Pls.' Opp. to Glenbrook–Brandt's Mot. at 19.)

Thus, the undisputed evidence does not establish that the Loughlins knew of the contamination on the 4825 property or that Glenbrook–Brandt fully disclosed all that it knew. This situation is markedly different from *Mancuso v. Consolidated Edison of New York*, 905 F.Supp. 1251 (S.D.N.Y. 1995), which Glenbrook–Brandt relies on in support of its summary judgment motion. (Glenbrook–Brandt Defs.' Reply at 10–11.) In *Mancuso*, plaintiff who had purchased a marina from defendant, claimed that defendant fraudulently concealed the source and the existence of PCB contamination. *Id.* at 1256. The court found that plaintiff had "actual knowledge of the injury to the

marina from PCB contamination." *Id.* at 1262. Plaintiff had admitted in prior sworn testimony in a state court action that defendant had told him that "the water at the marina was full of PCBs from the Con Edison plant on the other side of the channel." *Id.* at 1254. Unlike *Mancuso*, there is evidence to suggest that Glenbrook–Brandt did not fully inform the Loughlins of the condition of the 4825 property.

 Furthermore, the Loughlins' access the to property to have ECS conduct soil sampling prior to purchasing the house does not absolve Glenbrook–Brandt of its duty to disclose its supposed knowledge of the contamination. The doctrine of caveat emptor precludes a purchasers' recovery for real estate defects where, among other things, the defect is observable and discoverable by an ordinarily prudent person upon reasonable inspection. *See Moravek v. Hornsby*, 1997 WL 397012, *3 (Ohio Ct.App.1997) ("grading defects were open and discoverable ... by an ordinarily prudent person ... upon reasonable inspection.") (citing *Dennison v. Koba*, 86 Ohio App.3d 605, 621 N.E.2d 734 (1993)). The presence of toxic chemicals and munitions on the 4825 property were not observable, but rather were apparently impossible for anyone, no less an ordinarily prudent person, to discover. Even the soil tests conducted by ECS did not reveal evidence of contamination. Moreover, this Court has previously recognized the limited applicability of the doctrine of caveat emptor to residential, as opposed to commercial, property. *See Loughlin*, 209 F.Supp.2d at 172. As noted, the doctrine is sensible where subsequent users are able to avoid the harm by inspecting the property prior to purchase. *Id.* However, "the Court cannot say as a matter of law that the plaintiffs here ... would have

been able to discover the defects in the property by inspection." *Id.*

Finally, the entry of summary judgment at this stage in the litigation would be premature. Under Rule 56(f), where the party opposing summary judgment has not had an adequate opportunity to conduct discovery, the Court "may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had." Fed.R.Civ.P. 56(f). This Circuit has noted that courts should follow a generous approach toward granting Rule 56(f) motions. *Berkeley v. Home Ins. Co.,* 68 F.3d 1409, 1414–15 (D.C.Cir.1995). The Loughlins have yet to conduct discovery, and thus, it would be premature to grant Glenbrook–Brandt's motion.

For the reasons discussed above, Glenbrook–Brandt's motion for summary judgment is denied.

## CONCLUSION

For the aforementioned reasons, the Court denies defendant United States' motion to dismiss plaintiffs' claims, or in the alternative, for summary judgment and defendant United States' motion to dismiss defendant Glenbrook–Brandt's cross-claims except that the Court reserves decision on the government's argument that these claims are barred by the discretionary function exception to the FTCA. The Court also denies Glenbrook–Brandt's motion for summary judgment. Separate orders accompany this Memorandum Opinion.