**John FLYNN, et al., Plaintiffs,**

v.

**OHIO BUILDING RESTORATION, INC., et al., Defendants.**

**Civil Action No. 02–0921 (RBW).**

United States District Court, District of Columbia.

May 2, 2003.

Ira R. Mitzner, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Plaintiffs.

Richard D. Carter, Carter & Coleman, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

Currently before the Court is the Defendants' Joint Motion to Dismiss or Alternative Motion for Summary Judgment [# 5]. For the reasons stated below, defendants' motion will be denied.

### I. Factual Background

Plaintiffs are Trustees of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "the Fund"). Compl. ¶¶ 1, 3.[1] The IPF "is an 'employee benefit plan' within the meaning of Section 3(3) of [the Employee Retirement Income Security Act of 1974 ("ERISA")], 29 U.S.C. § 1002(3), and is a 'multi-employer plan' within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37)." *Id.* ¶ 3. The Fund "is administered in the District of Columbia." *Id.* ¶ 2. Defendant Ohio Building Restoration, Inc. ("Ohio Building") is a company that "maintain[s] offices

---

1. References to "Compl." are to the plaintiffs' complaint that was filed on May 10, 2002.

and conduct[s] business in the state of Ohio[,]" and "employs or ha[s] employed members of the International Union of Bricklayers and Allied Craftworkers and its affiliated local unions ("Unions")." *Id.* ¶¶ 5, 7. Defendant Exact Construction Services, Inc. ("Exact Construction") is, based upon plaintiffs' information and belief, "an alter ego of Ohio Building Restoration, Inc.,[because, among other things, the two entities have] interlocking directors, common control, common type of work and the same or similar employees." *Id.* ¶ 9.

Plaintiffs bring this action on behalf of the IPF in their role as trustees or fiduciaries. *Id.* ¶¶ 1, 3. Pursuant to the "Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkes ("CCU"), the IPF is authorized to effect [employer] collections on behalf of the International Masonry Institute ("IMI") and the Bricklayers and Allied Craftworkers International Union ("BAC") [and is] authorized to file suit on behalf of the BAC Local 1 Michigan Joint Delinquency Committee ..." *Id.* ¶ 4. Plaintiffs allege that the defendants have failed to make contributions to the Fund as required by the Collective Bargaining Agreement ("CBA") that defendant Ohio Building executed with the Unions. *Id.* ¶¶ 8, 11. In addition, plaintiffs allege that defendant Exact Construction "was obligated to make certain payments to the IPF, IMI, BAC and Local Funds on behalf of employees covered by the Agreement[,]" and has failed to make those payments in addition to failing to submit the required reports thus making "the amount owed [to] the IPF, IMI, BAC and Local Funds by Exact Construction ... undetermined, pending discovery." *Id.* ¶¶ 9–10. Based on the allegation that Exact Construction is an alter ego of defendant Ohio Building, plaintiffs seek an order declaring that both defendants "are jointly and severally liable for all amounts owed the IPF, IMI, BAC and Local Funds." *Id.* ¶ 1, at 5.

Defendants have filed a motion to dismiss plaintiffs' complaint, which is based on two grounds. First, defendants argue that this Court does not have subject matter jurisdiction over this matter because the plaintiffs are subject to the terms of the CBA and have failed to adhere to the grievance or arbitration procedures set forth in the CBA. Memorandum in Support of Defendants' Joint Motion to Dismiss or Alternative Motion for Summary Judgment ("Defs.' Mem.") at 4.[2] Second, defendants argue that this Court lacks personal jurisdiction over them under the "minimum contacts" analysis of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), because they are Ohio corporations, are not conducting business in the District of Columbia, and according to plaintiffs' allegations, failed to make contributions on be-

**2.** Plaintiffs argue that defendants failed to submit a proposed order with their motion to dismiss or alternatively for summary judgment, and failed to provide a statement of material facts as required by LCvR 7.1(h) and 56.1, respectively. Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Dismiss or Alternative Motion for Summary Judgment ("Pls.' Opp'n") at 2–3. In addition, plaintiffs argue that defendants' motion for summary judgment should be denied "as procedurally improper" because their "motion for summary judgment is premature as it has been filed before the entry of a scheduling order, and no discovery has yet occurred." *Id.* at 3. In its reply, defendant Ohio Building concedes that it erred by failing to attach a proposed order to its motion and not submitting the required statement of material facts. Defendant Ohio Building Restoration, Inc.'s Reply in Support of Defendants' Motion to Dismiss ("Ohio Reply") at 2. Defendants also "concede that summary judgment may not be appropriate here[,]" based on the fact that they are seeking dismissal on the grounds that this Court cannot exercise either subject matter or personal jurisdiction over them. *Id.* at 2 n. 1.

half of employees who reside in Ohio and worked on construction projects that were also located in Ohio or Michigan. Defs.' Mem. at 14–15.

In opposition, plaintiffs argue that they are not bound by the terms of the CBA because they were not a party to the agreement and compelling them to arbitrate pursuant to the terms of the CBA would violate their right to institute legal proceedings pursuant to their Trust Agreement, to which the defendants agreed they would be bound, and would contravene the purposes which underlie the ERISA. Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Dismiss or Alternative Motion for Summary Judgment ("Pls.' Opp'n") at 6, 10–17. Next, plaintiffs argue that the defendants' "minimum contacts" argument is not tenable because the District of Columbia Circuit has "held that agreeing to pay and then paying money into a pension fund located in the District of Columbia, and then failing to make those payments, subjects the contributing employers to personal jurisdiction in the District of Columbia for causes of action for collection of delinquent contributions under ERISA." *Id.* at 18–19 (citing *I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc.*, 699 F.2d 1254, 1259 (D.C.Cir.1983)).

In its reply, defendant Ohio Construction argues that the collective bargaining agreement at issue in this case is distinguishable from the agreements in cases where courts have held that trustees have not been bound by grievance procedures set forth in those agreements. Defendant Ohio Building Restoration, Inc.'s Reply in Support of Defendants' Motion to Dismiss ("Ohio Reply") at 2–4. In addition, Ohio Building notes that plaintiffs are arguing

that defendant Exact Construction is liable to them for contribution payments, an argument that "is expressly predicated upon the CBA in effect between [Ohio Building] and the Union[s,]" and thus, plaintiffs "are allegedly seeking to enforce the terms of the CBA, on the one hand, yet on the other seek to avoid the mandatory arbitration procedure also contained in the CBA." *Id.* at 6–7. And, in defendant Exact Construction's reply, it argues that although the Court "may arguably have jurisdiction over Defendant Ohio Building . . . under the holding of *I.A.M.* . . . the same cannot be said for Defendant [Exact Construction]." Defendant Exact Construction Service's Inc.'s Reply in Support of Defendants' Motion to Dismiss ("Exact Constr.'s Reply") at 1. This result is called for, Exact Construction argues, because it "has never conducted or transacted any business in the District of Columbia, has never entered into any agreement with any of the [p]laintiffs or any union, and has never made any pension contributions to any fund in the District of Columbia." Accordingly, Exact Construction contends that the Court should not exercise personal jurisdiction over it based "solely upon [plaintiffs'] conclusory allegation that [Exact Construction] is an alter ego of [Ohio Building]." *Id.* at 2.

## II. Analysis

### A. Standard of Review

 As indicated, defendants seek dismissal on two grounds: (1) plaintiffs' failure to exhaust the grievance procedures set forth in the CBA and (2) this Court's lack of personal jurisdiction over the defendants.[3] Defendants styled their motion as one seeking dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants' Joint Motion to Dis-

---

**3.** Defendant Ohio Building appears to have abandoned this second point because it does not refute plaintiffs' argument that, by virtue

of the *I.A.M.* decision, this Court would have personal jurisdiction over it. The Court will nonetheless address the issue of whether it

miss or Alternative Motion for Summary Judgment ("Defs.' Mot.") at 1. However, the motion should have been more appropriately entitled as a motion for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) ("lack of jurisdiction over the subject matter" of the complaint) and 12(b)(2) ("lack of jurisdiction over the person").[4]

■■■ "The distinctions between 12(b)(1) [,12(b)(2) ], and 12(b)(6) are important and well understood. Rule[s] 12(b)(1) [and 12(b)(2)] present[ ] ... threshold challenge[s] to the court's jurisdiction, whereas 12(b)(6) presents a ruling on the merits with res judicata effect." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.Cir.1987) (citation omitted). When reviewing a challenge pursuant to Rule 12(b)(1) or 12(b)(2), the Court may consider documents outside the pleadings to assure itself that it has jurisdiction. *See Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) ("when a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion ... the court may inquire by affidavits or otherwise, into the facts as they exist.") (citations omitted); *Haase*, 835 F.2d at 906 ("In 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.' ") (citations omitted); *Artis v. Greenspan*, 223 F.Supp.2d 149, 152 (D.D.C.2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction, or subject-matter jurisdiction.") (citation omitted). By considering documents outside the pleadings on a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(2), the Court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits *only* a 12(b)(6) motion to be converted into a motion for summary judgment." *Haase*, 835 F.2d at 905 (emphasis in original).

## B. Whether Plaintiffs are Bound by the Grievance Procedures Contained in the CBA

■■■ Defendants argue that this Court does not have subject matter jurisdiction

---

has personal jurisdiction over defendant Ohio Building. *See infra* at 17–19.

**4.** The Court notes that "[f]airness, not excessive technicality is the guiding principle under ... the Federal Rules of Civil Procedure." *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C.Cir.1982) (internal citations omitted). Thus, "[e]ven under Rule 12(b)(1), procedural safeguards equivalent to those in Rule 56 are required, with Rule 56 used selectively as a guide to ensuring fairness." *Id.* (citations omitted). In a case where the parties dispute "facts material to a jurisdictional time limit" for example, "Rules 12(b)(6) and 56 require that the court provide the parties a full opportunity to air the factual dispute." *Id.* In addition, "[t]he importance of fair procedures in factfinding at any stage requires this approach, whether or not the parties invoke the precise words in the Federal Rules." *Id.* at 360-61. In this case, the Court does not believe the plaintiff will be prejudiced by

the Court's consideration of defendants' motion pursuant to the standards of Rules 12(b)(1) and 12(b)(2). Here, the parties do not disagree about the facts but rather about whether legally plaintiffs are bound to adhere to the grievance procedures set forth in the CBA and arbitrate this dispute and whether the Court has personal jurisdiction over the defendants. These are purely legal issues that both parties have thoroughly briefed, and therefore the opportunity to submit additional evidence was not requested, or needed, by either party, as both parties have submitted the documentary evidence they believe support their respective claims. *Cf. Gordon*, 675 F.2d at 361 ("Under either Rule 12(b)(1) or Rule 12(b)(6), a court need not consider matters outside the pleadings at all. But once it decides to consult such matters it should so inform the parties and set a schedule for submitting additional affidavits and documents if the parties wish.").

over the plaintiffs' claims because plaintiffs have failed to exhaust their administrative remedies under the CBA. This argument raises a challenge to the Court's subject matter jurisdiction pursuant to Rule 12(b)(1). *See Artis*, 223 F.Supp.2d at 152 ("Failure to exhaust administrative remedies deprives a district court of subject matter jurisdiction.") (citation omitted). A challenge to the Court's subject matter jurisdiction can be either "facial" or "factual." *Loughlin v. United States*, 230 F.Supp.2d 26, 35 (D.D.C.2002) (citations omitted). A facial challenge challenges "the factual allegations of the complaint" contained on "the face of the complaint" while in a factual challenge, the contest is addressed to the underlying facts contained in the complaint. *Id.* at 36. In analyzing a facial challenge to its subject matter jurisdiction, "the Court considers the factual allegations of the complaint in the light most favorable to the non-moving party." *Id.* at 35 (citation omitted). However, in a factual challenge, such as the one before the Court where the defendants do not challenge the allegations on the face of the complaint, but the facts underlying those allegations, "[g]enerally, . . . allegations in the complaint are not controlling [and][t]he Court must weight the allegations of the complaint and evidence outside the pleadings in order to 'satisfy itself as to the existence of its power to hear the case.' " *Id.* at 36 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977) (citation omitted)). Further, " '[t]he existence of disputed material facts will not preclude the trial court

from evaluating for itself the merits of the jurisdictional claims.' " *Id.* (quoting *Mortensen*, 549 F.2d at 891) (citation omitted).

Defendants base their jurisdictional argument on the ground that plaintiffs must exhaust the grievance procedure contained in Article XII of the CBA before they can initiate an action in this Court. This section of the CBA provides:

### Grievance Procedure

A. It is specifically agreed that any controversy arising during the effective period of this Agreement involving the application or interpretation of any of its terms or conditions, other than a jurisdictional dispute over the assignment of work, shall be settled in accordance with the grievance procedure set forth in this Article.

Compl., Exhibit ("Ex.") A (Special International Masonry Industry Agreement), Art. XII, at 7.[5] Specifically, the grievance procedure provides that a grievance is first submitted to the local Union steward and the employer's representative (step one); if the grievance is not settled by step one, it is referred to the Local Union Business Manager and the employer's representative (step two); if the dispute is still not resolved, it is submitted to the International Union (step three); if the International Union is unable to solve the dispute, it then proceeds to the fourth and final step, which involves submission of the grievance to the "International Masonry Institute's Dispute Settlement Plan for resolution under the Plan's operating procedures referred to in Article IX of this Agreement.[6]

---

**5.** Defendants have also appended the CBA as Exhibit 1 of their Joint Motion to Dismiss.

**6.** Article IX provides, entitled "International Masonry Institute Disputes Settlement Plan" provides:

The Union, the Council and the signatory Employers agree to recognize, be bound by

and support the International Masonry Institute's Disputes Settlement Plan.

The Plan continues a relationship between labor and management in the masonry industry establishing procedures to improve collective bargaining between the parties in various labor agreements in the industry, to provide joint procedures for the mediation

The decision reached in accordance with the Plan's procedures shall be binding upon all parties." Ex. A., Art. XII, at 7–8. In addition, defendants argue that "Article XIV of the CBA expressly evidences an intent on the part of the [contracting] parties to subject the trustees to exhaustion of the arbitration procedures." Ohio Reply at 5.[7] Article XIV provides:

> A charge of violation of this Article [, which is entitled "Preservation of Work,"] *may be filed by the Union and/or the trustees of any of the joint trust funds provided for in this Agreement, and shall be considered a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes as provided in Article XII of this Agreement.*

Defs.' Mem., Ex. A, Art. XIV, at 8 (emphasis added).

In opposition, plaintiffs argue that it is "well-established" that the Unions and "an ERISA fund are separate entities," and, because the CBA was an agreement only between the Unions and the employers, and not the Fund, plaintiffs are not bound by the grievance procedure set forth in the CBA. Pls.' Opp'n at 4 (citations omitted). In addition, plaintiffs argue that the express terms of their Trust Agreement affords them the explicit right to institute lawsuits for the collection of delinquent contributions. *Id.* at 6. Plaintiffs principally rely upon the Supreme Court's opinion in *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984), which they argue is "dispositive" of the issues before the Court. Defs.' Mem. at 6.

In *Schneider,* the trustees of two multi-employer trust funds filed actions against two participating employers due to the employers' failure to "meet their contribution requirements and . . . refus[al] to allow an audit of their payroll records." 466 U.S. at 366, 104 S.Ct. 1844. In defense, the employers asserted that the trustees' arguments raised an issue regarding interpretation of the collective bargaining agreement and therefore the trustees had to first submit their claims to arbitration as provided for in the agreement, despite the fact that the trustees were not signatories to the agreements. *Id.* at 366–67, 104 S.Ct. 1844. In affirming the decision of the Eighth Circuit, which had ruled against the employers, the Supreme Court held that the trustees were not bound to the arbitration procedures set forth in the collective bargaining agreement for several reasons.

First, the Court held that the "presumption in favor of arbitrability"[8] was not applicable in *Schneider* because while the "presumption furthers the national labor

---

and conciliation of disputes in the negotiations of collective bargaining agreements, and to provide for final resolution of disputes over terms of collectively bargained agreements. Executed copies of the Plan are available upon request to parties signatory to this Agreement.

**7.** The defendants refer to the procedure in Article XII of the CBA as "arbitration" although the CBA refers to it as the "grievance procedure." For purposes of uniformity, the Court will adopt defendants' reference to the process as "arbitration."

**8.** The presumption of arbitrability was "applied" by the Supreme Court in the "Steel Workers Trilogy." *See Schneider,* 466 U.S. at 371 n. 12, 104 S.Ct. 1844 (citing *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

policy of peaceful resolution of labor disputes and best accords with the parties' presumed objectives in pursuing collective bargaining ... [t]here is ... less to commend the presumption in construing the applicability of arbitration clauses to disputes between the employer and the trustees of employee-benefit funds." *Id.* at 371–72, 104 S.Ct. 1844. This is so, the Court concluded, because unlike arbitration involving unions, which "promotes labor peace because it requires the parties to forgo the economic weapons of strikes and lock-outs[,]" arbitration between the trustees of a fund and the employer does not serve the same goal as "the trustees of employee-benefit funds have no recourse to either of those weapons [, and therefore], requiring them to arbitrate disputes with the employer would promote labor peace only indirectly, if at all." *Id.* at 372, 104 S.Ct. 1844. Second, having determined that the presumption of arbitrability was not applicable, the Court looked at the terms of the trust agreements, which authorized the trustees to initiate "any legal proceedings" to collect contributions, and found that "[n]owhere in the trust agreements is the exercise of that authority expressly conditioned on the exhaustion of any contractual remedies that might be found in the collective-bargaining agreements of individual employers." *Id.* at 373, 104 S.Ct. 1844. On this point, the *Schneider* Court noted that the trustees were "multiemployer trust funds" and, as such, each had "an interest in the prompt collection of the proper contributions from each employer. Any diminution of the fund caused by the arbitration requirements of a particular employer's collective-bargaining agreement would have an adverse effect on the other participants." *Id.* Third, the Court held that there was "no suggestion" in the arbitration clauses of the collective bargaining agreements "that either the [employers] or the Union in-

tended to require arbitration of disputes between the trustees and the employers." *Id.* at 374, 104 S.Ct. 1844. Indeed, the Court noted that the employers conceded that "the collective-bargaining agreements permit[ted] only the Union or the employer to invoke the arbitration process." *Id.* at 375, 104 S.Ct. 1844. Thus, because there was no suggestion that the Union "intended to incur [arbitration] expenses at the request of the trustees without any requirement that the trustees provide reimbursement[,] ... [and][t]here [was] no evidence that the Union owe[d] any statutory or contractual duty of fair representation to the trustees[,]" the Court refused to "engage the unlikely inference that the parties to these agreements intended to require the trustees to rely on the Union to arbitrate their disputes with the employer." *Id.* at 375, 104 S.Ct. 1844.

Plaintiffs are correct that the facts of *Schneider* are analogous to the present situation. *Schneider*, as this case, involved an attempt by employers to utilize an arbitration clause contained in a collective-bargaining agreement to which the trustees had not been parties, to force the trustees to arbitrate their claims regarding the contributions. However, the Court agrees with defendants that *Schneider* is not dispositive of the issues before this Court because of the distinguishing characteristics of the collective-bargaining agreements at issue in *Schneider* and the one at issue here.

In *Schneider*, the Court noted that the arbitration clauses in the collective-bargaining agreements there "contain[ed] no suggestion that either the [employers] or the Union intended to require arbitration of disputes between the trustees and the employers." *Id.* at 374, 104 S.Ct. 1844. In addition, the *Schneider* Court's holding, in part, relied on the fact that only the Union or the employers could initiate the

arbitration process under the collective-bargaining agreements, and there was no evidence that the Union intended to vicariously incur such expenses for the trustees or that the Union owed any "duty of fair representation to the trustees." *Id.* at 375, 104 S.Ct. 1844. The same cannot be said in this case. Pursuant to Article XIV of the CBA, "[a] charge of [a] violation of [Article XIV] ... may be filed by the Union *and/or the trustees* of any of the joint trust funds ... and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes as provided for in Article XII of this Agreement." Compl., Ex. A (emphasis added). This language distinguishes this case from *Schneider* because clearly the Unions and the employers here envisioned that the Fund's trustees could participate in the arbitration proceedings and actually initiate the arbitration process.

 The question for this Court then becomes whether, in light of the fact that the employers and the Unions expressly provided a mechanism by which the trustees could invoke the arbitration process and their indication that the arbitration process be utilized to resolve disputes of the nature involved in this action, cancel out the Restated Agreement and Declaration of Trust ("Trust Agreement") that provides the Trustees with explicit authority to institute and prosecute "such legal or administrative proceedings as the Trustees in their sole discretion determine to be in the best interest of the Trust Fund for the purpose of [the] collection such payments and money ..." Pls.' Opp'n, Ex. E [9] (Declaration of David Stupar, Executive Di-

rector of the Bricklayers & Trowel Trades International Pension Fund at Ex. 1 (Restated Agreement and Declaration of Trust of the Bricklayers and Trowel Trades International Pension Fund, October 2000), hereinafter referred to as "Pls.' Ex. E(1)" § 4.3).

In support of its position that the CBA trumps the plaintiffs' Trust Agreement, defendants rely on the case of *Central States, Southeast and Southwest Areas Pension Fund v. Goggin Truck Line, Inc.,* 140 F.R.D. 362 (N.D.Ill.1991), which the Court finds distinguishable from the instant situation. In *Goggin,* multi-employer pension funds instituted an ERISA action against an employer to recover alleged delinquent fund contributions. *Id.* at 363. However, unlike *Schneider* or this case, the language contained in the collective bargaining agreement in *Goggin* expressly provided that "[d]isputes ... concerning the requirement to make contributions on behalf of particular employees ... *shall* be submitted directly to the Conference Joint Area Committee by the Employer, the Local Union *or the Trustees.*" *Id.* (emphasis added). In addition, unlike *Schneider* or the current situation, there was evidence in *Goggin* that "at least one of the Fund's trustees ... participated in the negotiations of the [collective bargaining agreements] and was *instrumental* in developing their terms." *Id.* at 365 (emphasis added). Defendants in this case do not contend that the trustees were "instrumental" in developing the terms of the CBA, or that they were even aware of the provision which indicates that the trustees

<hr/>

**9.** In their opposition, plaintiffs refer to the Declaration of David Stupar as an attachment that is designated as Exhibit E. *See* Pls.' Opp'n at 19. However, the Stupar declaration does not reflect a designation as Exhibit E; it is merely appended at the end of plain-

tiffs' opposition without any designation. Nonetheless, the Court will refer to the Stupar declaration as Exhibit E in accordance with how plaintiffs indicate in their opposition the declaration should be designated.

can invoke the arbitration procedures set forth in the CBA.

Contrasting and comparing *Schneider* and *Goggin* to the facts of this case, the Court finds that of the two cases, *Schneider* has greater applicability to the current situation for several reasons. "Because there is no presumption of arbitrability, and because third-party beneficiary rules are not applied mechanically in the context of a collective bargaining agreement, *Schneider* stands for the proposition that courts must carefully examine the pertinent trust and collective bargaining agreements to determine whether the parties intended to arbitrate disputes between trust funds and employers." *Pipe Fitters' Welfare Fund, Local Union 597 v. Mosbeck Indus. Equip., Inc.,* 856 F.2d 837, 840 (7th Cir.1988). The Court's examination of those instruments here leads it to the conclusion that the facts of this case do not support a finding that the Unions and the employers intended to foreclose the Fund's ability to seek judicial recourse for actions to collect delinquent fund contributions.

First, like *Schneider*, there is no statement in the CBA that evidences any intent for the Fund to be bound by the grievance procedures provided in that document. Unlike the mandatory language in *Goggin,* *i.e.,* that the Trustees "shall" submit their claims to arbitration, the language relied upon by the defendants here merely provides that "[a] charge of violation of this Article *may* be filed by the Union and/or the trustees ..." Compl., Ex. A, Art. XIV at 8 (emphasis added). Although the provision goes on to provide that any such charge "shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes ... [,]" the Court construes use of the word "shall" as requiring that once the trustees exercise

their discretion to initiate the arbitration procedures, any such charge must then be processed according to the grievance procedures set forth in the CBA. *Cf. Pipe Fitters' Welfare Fund,* 856 F.2d at 842 (holding that Trust Fund was not bound to terms of collective bargaining agreement that mandated arbitration and stating that "[t]he intention of the parties" was "also reflected in the fact that the collective bargaining agreement d[id] not clearly allow the Trust Funds or its trustees to access the arbitration mechanism.").

In addition, the language contained in the grievance procedure itself mitigates against a finding that it was intended for the Trustees to be bound by its terms. The agreement provides:

> No grievance shall be recognized unless it is called to the attention of the Employer by the Union or Local Union or to the attention of the Union or Local Union by the Employer within five working days after the alleged violation is committed or should reasonably have been discovered.

Compl., Ex. A, Art. XII at 7. The absence of any reference to the Trustees in this provision is telling. Indeed, if as defendants argue, it was envisioned that the Trustees would be bound by the grievance procedure set forth in the CBA, the Trustees would have similarly been saddled with the obligation to notify either the Employer, the Unions, or both of alleged contribution violations. No such obligation having been placed on the Trustees strongly suggests that it was not intended for them to be covered by the grievance procedure. *See Teamsters Pension Trust Fund of Philadelphia & Vicinity, Teamsters Health & Welfare Fund v. C & M Servs., Co.,* No. Civ.A. 85–4836, 1987 WL 8821, at *3 (E.D.Pa. Mar. 31, 1987) (holding that collective bargaining agreement, which provided that disputes regarding employer

contributions "shall be submitted ... to the Conference Joint Arbitration Committee[,]," which was "composed solely of unions, employers, and their representatives" did not support a finding that the parties intended to bind the fund's trustees to the arbitration procedure. "There is no accommodation for the interests and rights of the funds in this procedure. Thus, the trustees should not have to submit disputes to an arbitration committee that does not represent their interests [and] ... the selection of an arbitrator by the parties is a 'fundamental characteristic' of arbitration agreements.") (citation omitted).

Second, and also persuasive, is the fact that the employers expressly agreed to be bound by the terms of the Trustees' Trust Agreement; however, no such reciprocal language regarding the Trustees is contained in the CBA or the Trust Agreement binding the Fund to the grievance procedure contained in the CBA. Specifically, Article VII of the CBA provides that the "Employer agrees to be bound by the terms, conditions, and provisions of such home trust fund agreements (copies of which will be available to the Employer upon request), and to make the contributions called for said funds at the rate and in the manner specified ..." Compl., Ex. A, Art. VII at 4. On the other hand, Article VI, section 6.3 of the Trust Agreement ("Controversies and Disputes"), explicitly provides that:

> The Trustees *may in their sole discretion* compromise or settle any claim or controversy in such manner as they think best, and any majority decision made by the Trustees in compromise or settlement of a claim or controversy, or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties interested in this Trust.

Pls.' Opp'n, Ex. E(1), Art. VI, § 6.3 (emphasis added). In addition, section 4.3 of Article IV ("Contributions and Collections") of the Trust Agreement states that the Trustees

> shall have the power to demand, collect and receive Employer payments ... [and] shall take such steps, *including the institution and prosecution of ... such legal ... proceedings as the Trustees in their sole discretion* determine to be in the best interest of the Trust Fund for the purpose of collecting such payments ...

*Id.,* Art. IV, § 4.3 (emphasis added). These provisions, to which the employers agreed to be bound, *see* Compl., Ex. A, Art. VII, contradict the employers' claim that the Fund relinquished its right to institute legal actions to collect delinquent fund contributions. *See Pipe Fitters' Welfare Fund,* 856 F.2d at 841 (in holding that trust fund was not bound to arbitration provision contained in collective bargaining agreement between the union and the employer, court stated, the fact "that the parties to the collective bargaining agreement were aware of the language in the trust agreements that allowed the trustees of the Trust Funds to bring civil actions seeking contributions ... [was] significant evidence of an intention that the Trust Funds not be bound by arbitration."); *Teamsters Pension Trust Fund,* 1987 WL 8821, at *3 (holding that "where there is a conflict between the arbitration clause and the powers granted to the trustees by the fund agreements, the latter control.").

Third, there is no indication in the Trust Agreement or in the CBA that the Fund agreed that the grievance procedure would trump the provisions of the Trust Agreement that expressly authorize the Fund to institute legal proceedings for the collection of delinquent fund contributions. On this point, it is significant that paragraph

(F) of the grievance procedure of the CBA provides that:

> It is expressly understood by the parties *hereto* that the procedure for adjustment of grievances set out in this Article is exclusive and supersedes any other plan, method or procedure.

Compl., Ex. A, Art. XII at 8 (emphasis added). As the Fund was not a party to the CBA, it would be illogical to conclude that the CBA's grievance procedure would take precedence over conflicting language in the Trust Agreement. *See Pipe Fitters' Welfare Fund,* 856 F.2d at 842 ("[n]one of the provisions [of the collective bargaining agreements] states in plain language an intention to override the provisions of the trust agreements that allow the Trust Funds to bring civil actions to enforce contributions."). Further, the Fund, as a multi-employer trust fund, is "responsible for protecting the interests of many employers and beneficiaries who are parties to different collective bargaining agreements." *Id.* at 841. As a result, if the Fund could be bound by each individual employer's collective bargaining agreements, its fiduciary obligations to collect delinquent contributions could be compromised, which could then potentially prejudice employees whose collective bargaining agreements are not as favorable as the agreements of other employees. *See id.* "For th[is] reason, the Court in *Schneider* left open the question of whether a collective bargaining agreement, even a carefully drafted one, can bind an employee-benefit trust fund to arbitration." *Id.*[10]

In conclusion, the Court finds that the CBA at issue in this case does not manifestly express an intent by the parties that the Fund would relinquish its rights accorded to it by its own Trust agreement and be bound by the grievance procedures set forth in the CBA. Although there is language indicating that the parties intended for the Fund to have access to the grievance procedures provided in the CBA, the Court concludes that this language does not evidence an intent that the Fund relinquish its express right to institute a civil action to collect delinquent contributions. Moreover, there is no evidence that the Fund was aware of the CBA grievance procedure or that it consented to be bound to its terms. For these reasons, the Court concludes that the defendants' motion to dismiss for lack of subject matter jurisdiction must be denied.

**10.** The Court is not holding that a Trust Fund can never be bound by the arbitration procedures set forth in a collective bargaining agreement. Rather it is only holding that the agreement in this case, to which the Trust Fund was not even a party, does not evidence the parties' intent that the agreement would foreclose the Fund's ability to initiate a lawsuit as authorized by the Trust Fund itself. Thus, although *Schneider* is distinguishable from this case, "*Schneider* does not hold squarely that the parties to a collective bargaining agreement can compel arbitration of employee-benefit trust fund contribution disputes by inserting plain language of such an intention in the agreement." *Pipe Fitters' Welfare Fund,* 856 F.2d at 841. In addition, as the Court in *Pipe Fitters'* recognized, the *Schneider* Court "hinted that the parties to a collective bargaining agreement may be incapable of compelling an employee-benefit trust fund to arbitrate unless the parties to the collective bargaining agreement are precisely the same parties that are privy to the relevant trust agreements." *Id.* (citing *Schneider,* 466 U.S. at 374, 104 S.Ct. 1844); *Schneider,* 466 U.S. at 374, 104 S.Ct. 1844 ("*Even if* we assume that the parties to the collective-bargaining agreements could negate by their agreement the powers conferred on the trustees by the broader group of parties to the trust agreements, we find no attempt to do so here.") (emphasis added). This rationale explains the holding of the *Goggin* court, wherein there was evidence that a representative of the trustees participated in the collective-bargaining agreement negotiations and, indeed, was "instrumental" in developing the terms of the agreement. 140 F.R.D. at 365.

## C. Whether the Court has Personal Jurisdiction Over the Defendants

 Initially, both defendants argued that because they are Ohio corporations and do not have sufficient "minimum contacts" with the District of Columbia, this Court did not have personal jurisdiction over them. Plaintiffs, in their opposition, argued that whether this Court could exercise personal jurisdiction over the defendants must be evaluated under the District of Columbia Circuit's holding in *I.A.M. Nat'l Pension Fund*, 699 F.2d at 1256–57. Plaintiffs opine that *I.A.M.* affords the Court authority to exercise personal jurisdiction over both defendants. At issue in *I.A.M.* was whether the district court in this jurisdiction had personal jurisdiction over the defendant, a Connecticut corporation, pursuant to ERISA's venue provision, 29 U.S.C. § 1132(e), where the defendant was served with the summons and complaint in New York. Section 1132(e) provides, in part:

> Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where the defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

The *I.A.M.* Court noted that *International Shoe* provided "a test for [determining] sufficient presence within a state to permit the exercise of personal jurisdiction by [a] state's courts under the Due Process Clause of the Fourteenth Amendment[,]" which presented a different issue than the one presented under section 1132(e) because under this provision "the question is not one of constitutional due process but of congressional intent in prescribing a test for venue in federal district courts." 699 F.2d at 1257. However, the Court ob-

served that "for service of process on a corporation to be valid under Section 1132(e)(2), the corporation's contracts with the district of service must meet the *International Shoe* test." *Id.* at 1258. The *I.A.M.* Court held that the defendant was properly "found" in the Southern District of New York, for purposes of proper service, concluding that "[f]rom its incorporation in Connecticut[,] Wakefield Industries has been dependent on its New York parent Capehart Corporation for business and decision-making." *Id.* at 1258. Moreover, the Court further indicated that "[e]ven if these corporate activities were insufficient to support general jurisdiction within the State of New York, the fact that Wakefield Industries' obligations to the Pension Fund were fulfilled in that state for almost 2 years makes the exercise of jurisdiction appropriate ..." *Id.* at 1259 (citation omitted). The Court also concluded that "[b]y making payments and reports to the Pension Fund in the State of New York, Capehart and its subsidiary Wakefield Industries availed itself of the privileges of that forum, and it is the cessation of these activities which gave rise to the present cause of action." *Id.* For these several reasons, the Circuit Court held that if Wakefield was properly served in New York, the district court in this jurisdiction could exercise personal jurisdiction over it.

In reaching its decision, the *I.A.M.* Court relied upon the Ninth Circuit's holding in *Varsic v. United States District Court for the Central District of California*, 607 F.2d 245 (9th Cir.1979). In *Varsic*, a complaint was filed against a pension fund in the Central District of California, *id.* at 247, where the fund "both receive[d] contributions from employers on behalf of employees working in the district and provided benefits to some beneficiaries who live[d] in the district[,]" *id.* at 249. At issue was whether the district court erro-

neously granted the defendant fund's motion to transfer the action to the District Court for the Southern District of New York. In concluding that the district court erred, the Ninth Circuit held that section 1132(e)(2)'s language, that venue is proper "where any defendant resides or may be found" evidenced Congress' intent for the provision to be given "broad application" and "[t]herefore, if personal jurisdiction [was] properly asserted over the Fund [in California], it [was] 'found' there." *Id.* at 248. Holding that personal jurisdiction could be exercised over the Fund in the Central District of California, the Ninth Circuit found that the Fund's contacts with the district were sufficient under *International Shoe. Id.* at 249. Although the *Varsic* Court did not reach the question of whether the Fund was subject to the general jurisdiction of the district court in the Central District of California, the court held that the "action directly involve[d] the Fund's activities in California and ... those contacts suffice[d] to subject the Fund to [the] jurisdiction [of the district court in California]." *Id.* Specifically, as indicated above, the court noted that the fund "purposely availed itself of the privilege of conducting activities in the Central District of California" by both receiving contributions and distributing benefits to employees in that district. *Id.* at 250. In addition, the court observed that it was "clear that the claim arose from the Fund's contacts with the forum" and the exercise of jurisdiction in the forum would be "reasonable" because the Fund "purposely placed itself in a fiduciary capacity and received contributions from the forum ... [and], therefore, could surely have anticipated the very type of claim involved ..." being filed against it in the Central District of California. *Id.*

Here, defendant Ohio Building does not contest the fact that the plan at issue is administered in the District of Columbia or that it knowingly made contributions to the plan in this district. Therefore, in accordance with the holdings in *I.A.M.* and *Varsic*, this Court has no reservations about holding that defendant Ohio Building is subject to this Court' jurisdiction.

■ The more difficult issue is whether the Court may exercise personal jurisdiction over defendant Exact Construction when "[p]laintiffs' allegation that this Court has jurisdiction ... is solely predicated on their allegation that Exact Construction is an alter ego of [Ohio Building] ..." Exact Constr.'s Reply at 1. Exact Construction argues that this Court should not accept plaintiffs' unsupported legal conclusions because Exact Construction "has never conducted or transacted any business in the District of Columbia, has never entered into any agreement with any of the [p]laintiffs or any union, and has never made any pension contributions to any fund in the District of Columbia." *Id.* at 2.

■ For purposes of ERISA actions, the fact that defendant Exact Construction has not conducted business in this district does not preclude the Court's exercise of personal jurisdiction over it. Section 1132(e) of ERISA "has been interpreted to authorize nationwide service of process." *Briesch v. Automobile Club of Southern California*, 40 F.Supp.2d 1318, 1320 (D.Utah 1999) (citing *United Elec. Workers v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1086 (1st Cir.1992)). "Where Congress has authorized nationwide service of process, a federal court may exercise personal jurisdiction over any United States resident, without regard to whether its sister state court could assert jurisdiction under minimum contacts principles." *Combs v. Adkins & Adkins Coal Co.*, 597 F.Supp. 122, 125 (D.D.C.1984) (citations omitted); *see also Medical Mutual of Ohio*

*v. deSoto,* 245 F.3d 561, 567 (6th Cir.2001) (upholding district court's exercise of personal jurisdiction over defendants and rejecting the defendants' claim that under § 1132(e) the Court had to engage in a two-part test to determine whether the defendants had sufficient contacts with both the United States and with the forum state. The court stated, "[i]n essence, then, the deSotos urge this court to hold that § 1132(e)(2) has no effect on the personal jurisdiction inquiry in ERISA cases.... Because of the national service of process provision, the district court's exercise of jurisdiction was not 'extra-territorial but rather nationwide,' and therefore, the 'minimum contacts analysis, as a limitation on state extra-territorial power,'" was not applicable); *Bellaire Gen. Hosp. v. Blue Cross Blue Shield,* 97 F.3d 822, 826 (5th Cir.1996) (upholding district court's denial of defendant's motion for dismissal of the complaint on the basis of lack of personal jurisdiction under § 1132(e)(2), stating "when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States."); *Central States, Southeast & Southwest Areas Pension Fund v. LaCasse,* 254 F.Supp.2d 1069, 1072 (C.D.Ill.2003) (holding that "[t]he defendants, citizens of Minnesota, have minimum contacts with the United States, which are [sic] the only requirement for the exercise of personal jurisdiction by a federal district court over defendants in an ERISA-based action.") (citing 29 U.S.C. § 1451(d)); *Univ. of Mass. Med. Ctr. v. C & M Corp.,* 16 F.Supp.2d 110, 111–12 (D.Mass.1998) (holding that district court in Massachusetts had jurisdiction over defendant, a Connecticut corporation, whose "only contact with Massachusetts [was] that a single employee assigned to represent the company in a large New England territory that include[d] Massachusetts.... By virtue of the fact that C & M was lawfully served within the United States pursuant to [ERISA,] ... under the law of th[e] circuit, th[e] Court [concluded that it] ha[d] personal jurisdiction over C & M.") (citation omitted).

 This Court finds that its conclusion that it can exercise personal jurisdiction over defendant Exact Construction Services is not inconsistent with the rationale underlying *International Shoe.* As the *Medical Mutual* Court explained:

When ... a federal court sitting pursuant to federal question jurisdiction exercises personal jurisdiction over a U.S. citizen or resident based on a congressionally authorized nationwide service of process provision, th[e] [defendant's] individual liberty interest is not threatened. In such cases, the individual is not being subject to extra-territorial jurisdiction, because the individual is within the territory of the sovereign—the United States—exercising jurisdiction. In other words, when a federal court exercises jurisdiction pursuant to a national service of process provision, it is exercising jurisdiction for the territory of the United States and the individual liberty concern is whether the individual over which the court is exercising jurisdiction has sufficient minimum contacts with the United States.

245 F.3d at 567–68 (footnote containing citations omitted). In accordance with this reasoning, this Court concludes that Exact Construction's alleged lack of contacts with the District of Columbia does not preclude the Court from exercising personal jurisdiction over it. Although it may be "inconvenient to the defendant[ ] [to have to

defend this action in this district],[11] it is convenient to the plan, reducing its costs, to the benefit of all plan beneficiaries. Congress has balanced the plan's interest and permitted suit where the plan is located." *Id.* at 568 n. 4. *But see Peay v. BellSouth Med. Assistance Plan,* 205 F.3d 1206, 1212 (10th Cir.2000) ("[W]e hold that in a federal question case where jurisdiction is invoked based on nationwide service of process, the Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant.... The burden is on the defendant to show that the exercise of jurisdiction in the chosen forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent.'") (citations omitted); *Univ. of Mass. Med. Ctr.,* 16 F.Supp.2d at 112 (although the court held that ERISA's nationwide service of process provision accorded the court personal jurisdiction over a foreign defendant with no significant contacts within the state, the court "note[d] the anomalous consequence of interpreting defendants' right to Due Process under the Constitution as coextensive with Congress' statutory provision for service of process. In this case, by virtue of its self-funded health benefits plan, a local employer with no control over its employees' travels is subjected to the jurisdiction of a remote court in the United States located where its employee happens to require medical treatment.").

Defendant Exact Construction argues that plaintiffs seek to have this Court exercise jurisdiction over it solely based upon their "conclusory allegation that [Exact Construction] is an alter ego of [Ohio Building]." Exact Constr. Reply at 2. This same situation was confronted by the Seventh Circuit in *Board of Trustees, Sheet Metal Workers' National Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031 (7th Cir.2000). In that case, the plaintiff pension fund filed suit in the United States District Court for the Eastern District of Virginia against Elite Erectors, Inc. ("Elite"), an employer obliged to contribute to the fund pursuant to a collective bargaining agreement. After Elite defaulted, but prior to the court's entry of judgment against it, plaintiffs amended their complaint to name Skylight Consultants of America and Mary Lowry as Elite's alter egos. *Id.* at 1033. Skylight and Lowry also defaulted. *Id.* After judgments were entered against all three defendants in Virginia, plaintiffs registered the judgments in the United States District Court for the Southern District of Indiana, where Lowry resided and where Skylight conducted business. *Id.* Both Skylight and Lowry then sought to have the Indiana court declare the Virginia judgment void because, they argued, the district court in Virginia lacked personal jurisdiction over them, although they did not deny that they had been served with process. *Id.* The Indiana district court agreed "conclud[ing] that personal jurisdiction could be established in Virginia only if Skylight and Lowry were Elite's alter egos, as the Funds' complaint asserted[,]" *id.* at 1035, which the court concluded had not been established, *id.* at 1033. The Seventh Circuit rejected the Indiana district court's conclusion, stating that the district court had interpreted

**11.** On this point, the Court notes that Exact Construction has not offered any specific arguments regarding why it would be inconvenient for it to defend this action in this jurisdiction, despite the fact that both defendants are represented by the same attorney, who has an office in Alexandria, Virginia. If inconvenience is a problem, that concern can be raised in a different motion with a request for appropriate relief, such as transfer to another district.

§ 1132(e) as if it allowed nationwide service (and thus personal jurisdiction) only with respect to 'employers' or, more generally, 'persons liable under ERISA,—a step that would conflate jurisdiction with the merits.' Section 1132(e)(2) does not say this; it provides nationwide service to bring 'a defendant' into the action. Whether the defendant is liable under ERISA is the subject to be litigated following service; it is not a condition precedent to personal jurisdiction.... Section 1132(e) does not require or tolerate creative interpretation. 'Defendant' means defendant; Skylight and Lowry were defendants in the Virginia action and were served with process under § 1132(e)(2); the district court [in Virginia] therefore had personal jurisdiction unless section § 1132(e)(2) violates the Constitution[,]

*id.*, which the Court concluded was not the case, *id.* at 1035–36.

In accordance with the holding of *Elite Erectors*, this Court concludes that it has personal jurisdiction over defendant Exact Construction in this action. Whether or not defendant Exact Construction will be found liable under plaintiffs' "alter ego" theory is a separate issue from whether there exists jurisdiction over it pursuant to ERISA's nationwide service provision. And, because ERISA's nationwide service provision permits the Court to exercise jurisdiction over Exact Construction because it is a citizen of the United States, the Court concludes it has personal jurisdiction over defendant Exact Construction. Accordingly, defendant Exact Construction's motion to dismiss, which is predicated on its claim that the Court cannot exercise personal jurisdiction over it, must be denied.[12]

12. An order consistent with the Court's ruling accompanies this Memorandum Opinion.

### *ORDER*

In accordance with the Memorandum Opinion that is being issued contemporaneously with this Order, it is hereby

**ORDERED** that Defendants' Joint Motion to Dismiss or Alternative Motion for Summary Judgment [# 5] is denied. It is further

**ORDERED** that the parties Joint Consent Motions to Modify the Scheduling Order [# 18, # 19] are denied as moot.[1]

1. The Court held a status conference in this matter on April 14, 2003, at which time it issued a scheduling order.